750 So.2d 784 (1998)
STATE of Louisiana
v.
Ronald James LETULIER.
No. 97-KA-1360.
Supreme Court of Louisiana.
July 8, 1998.
*786 M. Craig Colwart, Franklin, Counsel for Applicant.
Richard Phillip Ieyoub, Attorney General, Bernard E. Boudreaux, Jr., District Attorney, John Phillip Haney, St. Martinville, Counsel for Respondent.
JOHNSON, Justice.[*]
This is a capital case where the defendant chose to plead guilty to first degree murder and a jury then sentenced him to death. On March 5, 1996, a St. Martin grand jury indicted Ronald James Letulier, and his wife, Stephanie, for the February 5, 1996 first degree murder of Wilmer Blanchard, Sr. in violation of R.S. 14:30.[1] The state also charged defendant with the February 6, 1996 attempted first degree murder and armed robbery of Linda Badon, and simple arson of her residence.
On December 17, 1996, defendant pled guilty to the first degree murder charge pursuant to La.C.Cr.P. art. 557.[2] On January 13, 1997, the district court commenced a sentencing hearing before a jury to determine whether defendant should receive the death penalty or life imprisonment without benefit of parole, probation, or suspension of sentence. On January 21, 1997, the jury unanimously determined that defendant should be sentenced to death and on January 30, 1997, the trial court imposed that sentence.
Also on January 30, 1997, defendant pled guilty to the amended charged of attempted second degree murder, armed robbery, and simple arson, relative to the offenses of February 6, 1996. The trial judge imposed the maximum sentence on each count and ordered the sentences to be served consecutively with one another and consecutive to defendant's death sentence.[3] Defendant now appeals his capital sentence on the basis of four assignments of error, two argued and two unargued. In an effort to reverse his fate, defendant raises four assignments of error. For the reasons that follow, we affirm the jury's sentence.

FACTS
Wilmer Blanchard, Sr., age 85, lived next door to two of his eleven children in Catahoula, Louisiana. On Monday, February 5, 1996, he and his daughter, Sonia, had coffee together before Sonia went to work, as they regularly did. Mr. Blanchard then set out to the St. Martin Bank and Trust Co. to cash two Social Security checks, totalling $590.00. A bank representative testified that Mr. Blanchard did not maintain a checking account and always used cash. Around 9:30 or 10:00 a.m., Mr. Blanchard stopped by the Catahoula Water System and paid his water *787 bill. He then returned home to prepare and eat lunch, as he always did, with his son, Wilmer, Jr., who lived in an apartment behind Sonia's house. Wilmer, Jr. last saw his father alive around 12:30 or 1:00 p.m. on February 5, 1996.
The next morning, Sonia noticed that her father's truck was not at home when she went to check on him. Thinking he had perhaps gone to the store, she went on to work and did not become concerned until her brother, Wilmer, Jr. called around noon asking if she knew where their father was. Sonia came home, and using her key she entered her father's house. Upon inspection, she noticed that her father's bed was made and that nothing appeared out of place. However, Mr. Blanchard routinely took meat out of the freezer to thaw after lunch to cook for the next day's meals. Sonia was concerned because meat was still left out on the counter and the wood stove was ice cold.
Sonia called her other brothers and sisters, but no one had seen their father. Wilmer, Jr. worked for the St. Martin Sheriffs Department, and he along with some other deputies, began searching the levee, because one of the victim's daily pastimes was to check the water level and report to his sons and sons-in-law, who were crawfishermen.
On the morning of February 5, 1996, Letulier and his wife Stephanie, began arguing around 6:00 a.m. about how they were going to pay the bad checks that they had written. Defendant's niece, Ernestine Sonnier, who resided with them, overheard defendant and Stephanie discuss robbing people to get the money. Defendant left the house and later returned for Stephanie.
Defendant admitted that he and Stephanie were riding around looking for someone to rob so that they could purchase more crack cocaine when they saw Wilmer Blanchard, Sr. pull up on the levee at the Stafford Melancon Landing. Defendant told Stephanie to pull in behind him.[4] Defendant got out of the car and began stabbing the victim with a kitchen knife. The victim sustained four stab wounds, two to the chest, one to the temple, and one beneath the collarbone.[5] Defendant removed the victim's wallet from his pants and stuffed the victim's body back into the truck. Letulier then drove the truck into the bayou and as it submerged, he swam out. Defendant and Stephanie then drove to Lafayette and purchased crack with the $280 defendant took from Mr. Blanchard.
The following morning, defendant told Stephanie that he was going back out to rob again to obtain money for more drugs. At that point she indicated that she did not want anything to do with it. Defendant left the house in the early morning, but ran out of gas just as he approached a service station. He called a friend he had known from jail who lived close by, Nanette Robichaux, who drove over to the service station around 8:30 a.m. and brought defendant five dollars for gas.
Letulier decided to pass by Linda Badon's house, which he had rented in early 1995, to retrieve his mail. Specifically defendant was looking for his W-2 form. He decided to rob Mrs. Badon and knowing that her husband worked for extended periods offshore, defendant queried Mrs. Badon as to whether she had any money, asking "Well, like, if you need money until he gets back in or whatever?" When she indicated that she had enough to get by, defendant left the house to retrieve a knife from his car.[6] Mrs. Badon followed him out of the house and he acted as if he was going to get a beer he had left in the car.
*788 Upon re-entering the house, Letulier proceeded to stab Mrs. Badon some 29 times, until the knife handle broke off. He admitted at trial that his intent was to kill her so that there would be no witness. Defendant then left with Mrs. Badon's purse and was pulling out of the driveway when he looked back and saw her struggling out of the house.
Realizing that his victim was not dead and could possibly scream for help, defendant drove back around and hit Mrs. Badon with his car, knocking her into the adjacent field. His car then hit the fence and got stuck in the mud. Defendant tried to camouflage the body with a blanket, grass and branches. Once again, he left Mrs. Badon for dead.
Letulier then walked down the road to Murphey Oubre's farm, where he had previously worked as a laborer. Mr. Oubre's son, Brian, recalled that defendant showed up at the farm around 10:30 a.m. Brian used a tractor and pulled defendant's dark blue Ford Thunderbird out of the mud. The defendant then drove to a nearby convenience store and purchased a bottle of rubbing alcohol and drove back to Mrs. Badon's house. When he checked on his victim he saw that her body was still moving. He then took a tire iron from his trunk and beat her about the head until he crushed her skull and jaw, broke her nose and blinded her in the left eye. Defendant once again covered Mrs. Badon's seemingly lifeless body with grass and debris, and threw the tire tool into the field. He then went in her house, doused the curtains with rubbing alcohol and set the house on fire so that evidence, including his fingerprints and blood, would not be found.
Realizing that he had to get out of town, defendant drove home and picked up his wife. On their way out of town, they drove back towards Mrs. Badon's house and parked in a field to watch the fire from a distance and to see if anyone had discovered her body. Defendant forgot that he needed a change of clothes, so around 2:00 p.m., he called his former brother-in-law, Wilbert St. Julien, and had Stephanie go in to pick up the clothes. However, St. Julien came out of the house and asked for a ride to his mother's house. St. Julien noticed defendant's clothes and hands were bloody. Defendant told him about Mrs. Badon and that he had robbed and killed an old man the day before. Defendant then changed clothes, disposed of the bloody clothing, the knife handle, and wallet in Lake Martin, and threw the purse out onto Lake Martin Road. Sensing that the police may already be looking for him, defendant advised St. Julien that he could not take him any farther. Defendant and Stephanie then proceeded to Lafayette to buy drugs and then to Nashville, Tennessee.
John Childers of the Louisiana State Police heard the report of the fire on his police radio around 1:00 p.m., and since he was about to finish his shift for the day, decided to pass by the fire on his way home. He observed that the farmhouse was totally destroyed and as he surveyed the area, he noticed an unusual pile of trash out in the field. Upon his approach, he saw an arm move and notified the fire fighters that there was someone lying in the field. The officers were amazed that even in her extremely wounded condition, Mrs. Badon seemed to express fear that her attacker had returned to hurt her, and she was battling to prevent that.
Shortly afterwards, St. Martin Sheriff Detective Joseph Arthur Boyd, investigated the attempted murder and robbery of Linda Badon and immediately sought defendant for questioning, only to learn that Letulier was not home. Detective Boyd set up surveillance at defendant's house around 1:30 or 2:00 p.m. when the dispatch division contacted him about a 911 call received from Wilbert St. Julien in reference to a homicide. St. Julien relayed to the detective the details which defendant had earlier told him. St. Julien then led the authorities to the evidence defendant had discarded at Lake Martin. On February 8, 1996, having exhausted most of the $150-175 on crack that defendant took *789 from Mrs. Badon, he contacted a relative, David Bryant, in Ohio to wire him some money in Nashville. However, the authorities were tipped off to defendant's request, and Nashville police arrested defendant as he entered the Western Union office inside a Kroger store.
Defendant's hand was severely infected and swollen from being cut by barbed wire when he tried to free his car after wrecking into the fence at Mrs. Badon's house. The Nashville officers immediately sought medical treatment for defendant.
On February 9, 1996, detectives from St. Martin Parish traveled to Nashville in an attempt to speak with defendant. However, the doctors gave the detectives a five-day time frame because defendant was medicated to combat the pain from blood poisoning.
On February 11, 1996, St. Martin Parish Sheriffs' divers located Mr. Blanchard's truck in about 25 feet of water at the Stafford Melancon Landing. Mr. Blanchard's body was recovered inside the truck. Contents found on this victim included 27 cents, a chain with a medal, and a pocket knife. No wallet was recovered.
The St. Martin Parish detectives returned to Nashville and on February 14, 1996, after the detectives advised defendant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), defendant fully confessed to both the murder of Wilmer Blanchard, Sr. and the attempted murder of Linda Badon.

DISCUSSION

Assignment of Error No. I
Defendant first asserts that the trial court erred in excusing for cause, prospective juror, Adley Douet. The trial court initially questioned the prospective jurors regarding their knowledge of the case, the parties and on the Witherspoon/Witt inquiries.[7] Mr. Douet responded that he knew about the alleged offense through personal discussions and through the newspapers, both at the time of the offense as well as shortly before defendant's trial. Mr. Douet also acknowledged that he is a close friend of one of Mr. Blanchard's daughters and that his wife is a cousin of the victim's wife's son.
At a bench conference, the trial judge expressed her inclination to excuse Mr. Douet for cause, despite the absence of any challenge by the state or the defense. The state then questioned Mr. Douet as to whether he would want somebody in his frame of mind on the jury if he or one of his relatives were charged with murder, given his relationship with the victim's family. Mr. Douet responded that he would not. He admitted that although he would try to be fair and impartial if he had to, he just did not think he could. He further stated that his relationship with the Blanchard family would always be in the back of his mind if called upon to consider the appropriate penalty. Mr. Douet stated that he felt that he could do a better job as a prospective juror if he did not know any of the victim's family members. Finally, Mr. Douet concluded that he could not put aside his relationship with the Blanchard family such that it would not influence his decision in the case. The court then dismissed Mr. Douet for cause on its own motion and over defense objection. Defendant claims that the trial judge abused her discretion in dismissing Mr. Douet and deprived defendant of his right to accept this juror.
La.C.Cr.P. art. 787 provides that "[t]he court may disqualify a prospective petit juror from service in a particular case when for any reason doubt exists as to the competency of the prospective juror to serve in the case." The official comments to art. 787 provides as follows:
This article is very broad, but it is essential to give the court a wide latitude to determine jurors' qualifications in the particular situation of each case. This *790 article complements to a degree arts. 797 and 798 which list special challenges for cause. It is necessary to give the judge the right to disqualify, a challenge being available only to counsel.
Thus, La.C.Cr.P. art. 787 should be read in pari materia with La.C.Cr.P. art. 797 and art. 798 which set forth the grounds upon which a juror may be challenged for cause.[8] This Court has held that the excusal of a prospective juror by the trial court, even ex proprio motu, is within its authority under La.C.Cr.P. art. 787. "[A] trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror." State v. Lee, 92-2810, (La.5/23/94); 637 So.2d 102, 108; See also State v. Davis, 411 So.2d 2, 5 (La.1982); State v. Chapman, 410 So.2d 689, 695 (La.1981); State v. St. Andre, 263 La. 48, 267 So.2d 190, 191 (1972). Substantial deference is to be accorded a trial court's determination that a particular juror is unfit for service; in reviewing such determinations, the standard is whether the trial court's finding was "fairly supported by the record." Wainwright v. Witt, 469 U.S. 412, 433, 105 S.Ct. 844, 857, 83 L.Ed.2d 841 (1985). Additionally, absent a clear showing of abuse of discretion, the trial court's ruling as to the qualifications of a juror to serve should not be disturbed on appeal. State v. Jones, 315 So.2d 650, 653 (La.1975).
In the instant case, viewing the voir dire as a whole with respect to Adley Douet, the record reflects his inability to put aside his relationship with the Blanchard family. Accordingly, while a relationship between a juror and the victim will not automatically disqualify a prospective juror, the trial judge properly recognized that Mr. Douet should not be called upon to decide the appropriate penalty for defendant by serving as a juror. State v. Blanton, 312 So.2d 329, 331 (La.1975); State v. Hodgeson, 305 So.2d 421, 425 (La.1974). This assignment lacks merit.

Assignment of Error No. II
Defendant contends that the trial court erred in granting the state's motion to determine the admissibility of unadjudicated other crimes evidence, and in allowing the state to present the entire testimony of Linda Badon as other crimes evidence. In defendant's view, by presenting the testimony of Linda Badon, "who related the gruesome details of the horrible crime perpetrated upon her by the defendant," after having previously elicited the details of this crime through the testimony of the investigating officers, the state injected a cumulative and arbitrary *791 factor into the proceedings prohibited by State v. Bourque, 622 So.2d 198 (La.1993). Also, the trial court erred in denying his motion for mistrial based on Mrs. Badon's testimony.
La.C.Cr.P. art. 905.2 provides that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on the family members." In State v. Brooks, 541 So.2d 801 (La.1989) this Court approved the state's introduction in its case-in-chief in the penalty phase of two unrelated and unadjudicated murders once the trial judge determined that: (1) the evidence of the defendant's commission of the unrelated criminal conduct is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the unrelated conduct has relevance and substantial probative value as to the defendant's character and propensities. Brooks, 541 So.2d at 814.
In State v. Jackson, 608 So.2d 949 (La. 1992), we granted pre-trial writs to establish limitations on the admissibility of unrelated and unadjudicated criminal conduct in capital sentencing hearings.[9] We held that the evidence of the unadjudicated criminal conduct must involve violence against the person of the victim for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for capital murder. Jackson, 608 So.2d at 955.
In Bourque, this court held that evidence of an unrelated and unadjudicated killing, committed one hour before the murder at issue in the capital case being tried, was admissible, since it was relevant evidence of Bourque's character and propensities and fell within the Brooks and Jackson limitations. However, we reversed Bourque's death sentence on the basis that the prosecutor conducted a "prohibited mini-trial" on the issue of the defendant's guilt or innocence in the unrelated killing. Of the 12 prosecution witnesses in the penalty phase, 11 testified about the unrelated killing, which this Court held resulted in "impermissibly shift[ing] the focus of a capital sentencing jury from considering the character and propensities of the defendant to a determination of guilt or innocence of the unadjudicated criminal conduct." Bourque, 622 So.2d at 248.
However, we retreated from Bourque in the decision of State v. Comeaux, 93-2729 (La.7/1/97); 699 So.2d 16.[10] We determined that the Bourque restriction on the amount of evidence, no matter how highly relevant to the defendant's character and propensities, was unnecessary to guarantee due process.[11]Comeaux, 699 So.2d at 22. However, future trial judges should be mindful that they:
should cautiously consider the quantum of evidence necessary to convey the message to the jury that the defendant has engaged in other serious criminal conduct that the jury should consider in its determination of sentence, without shifting the jury's focus from its function of determining the appropriate sentence *792 in the capital case to a focus on the defendant's involvement in other unrelated criminal conduct.
Comeaux, 699 So.2d at 23.
In the instant case, on December 9, 1996, before defendant entered his guilty plea to the first degree murder of Mr. Blanchard, the state filed a motion captioned "Motion to Determine Admissibility of Non-Adjudicated Crimes for use in Penalty Phase." The state noticed its intent to introduce evidence that the defendant committed other crimes including attempted first degree murder and simple arson on or about February 6, 1996. Accordingly, the state fulfilled the notice requirement, the first guideline set forth in Comeaux.
Subsequently, on December 17, 1996 and in open court, defendant pled guilty to the charge of first degree murder pursuant to La.C.Cr.P. art. 557. In accepting defendant's guilty plea, the court heard the state's evidence to support a factual basis for the plea in the murder of Mr. Blanchard. Included in that hearing, the state proffered the testimony of Detective Marcus Guidry, who took defendant's confession in the Badon incident, and the videotape of defendant's confession.
On December 27, 1996, the trial court rendered its rulings on pre-trial motions, including the state's motion to introduce evidence of unadjudicated crimes in its case-in-chief at the penalty phase. The trial judge found defendant's confession to have been freely and voluntarily given, and held as follows:
Considering all of this evidence, the court finds that the requirements of Jackson and Brooks have been met. The evidence of this defendant's connections to the attack on Mrs. Badon is clear and convincing; the testimony of Det. Guidry and the confession are competent and reliable evidence; the brutality of the crime is relevant to the character of the perpetrator; the unadjudicated crime involves violence against a person; the time limit for prosecution has not run.
Therefore, the court rules that the proffered evidence of the attack on Ms. Badon may be admitted in the penalty phase of the trial of the defendant. If the proffered testimony is the only evidence admitted on this issue, the court does not anticipate that an arbitrary factor will be injected. That issue is pretermitted to trial. State v. Bourque, 622 So.2d 198 (La.1993). (Emphasis supplied).
The trial court's colloquy reflects scrupulous attention to this Court's directives and as such comports with the second Comeaux guideline that the court conduct a hearing to determine the admissibility of the evidence under the analysis of Brooks. Finally, the trial court observed that the evidence proffered by the state complied with the Jackson limitation of violent criminal conduct and timeliness, and thus complied with the third Comeaux guideline.
Before Mrs. Badon took the stand, defense counsel objected to her testifying, which the trial court overruled. Following a brief recess, and before Mrs. Badon testified, the state and defense counsel agreed that the state would be allowed to ask leading questions to Mrs. Badon in an attempt to comply with Bourque and Brooks.[12] At the close of Mrs. Badon's testimony, defense counsel moved for a mistrial on the grounds that the testimony exceeded the bounds of Brooks.
In presenting the evidence of unadjudicated criminal conduct, specifically the Badon incident, the state called eight witnesses who testified about the defendant's activities leading up to the offenses which comprised the unadjudicated criminal conduct at issue. The first witness called was Nanette Robichaux. In her testimony, the state established that defendant was out driving around at about 8:00 or 8:30 a.m. the morning of February 6, 1996 and ran *793 out of gas at a convenience store near her house. She also testified that she loaned defendant $5.00 for gas, but was curious that he did not take the road to go back to his home, as he had indicated to her.
The second witness to testify about matters relative to the Badon incident was Brian Oubre. Through his testimony the state established that defendant got his blue Thunderbird bogged down in the mud and sought assistance from his former employers at the nearby Oubre farm. Brian Oubre also placed defendant in the vicinity of Mrs. Badon's home around 10:30 a.m. on the morning of February 6, 1996.
The third witness to testify about the Badon incident was State Trooper John Childers. He was the first person to notice Linda Badon's body under the pile of debris in the field. He testified to Mrs. Badon's battered condition and the fact that she survived the brutal attack. He also verified that when he arrived on the scene, Mrs. Badon's house was destroyed by fire.
The next witness to testify about the Badon incident was Ned Decoux who testified that he found a tire tool in the field beside Mrs. Badon's house on February 7, 1996.[13]
The fifth witness to testify about facts related to the Badon incident was Wilbert St. Julien. His testimony established that he provided defendant with a change of clothes sometime around 2:00 p.m. on February 6, 1996. He also testified that he rode in the car with defendant and his wife, Stephanie, to Lake Martin where defendant changed clothes. St. Julien saw defendant discard the bloody clothes and other evidence of defendant's crimes in and around the lake. St. Julien further testified that defendant confessed to him that he had killed Mrs. Badon and that he killed an old man the night before. St. Julien also acknowledged that defendant and Stephanie had written bad checks to buy crack cocaine and that he had smoked crack with them on several occasions.
The sixth and seventh witnesses to testify regarding the Badon incident were employees of the St. Martin Parish Sheriff's office, Joseph Arthur Boyd and Marcus Guidry.[14] Detective Boyd testified that defendant was a suspect in the Badon incident, and in seeking defendant for questioning, Boyd learned from Wilbert St. Julien of defendant's admitted involvement in the Badon incident as well as the Blanchard murder. Based on Boyd's conversation with St. Julien, Boyd located and retrieved Mrs. Badon's purse, the knife handle, and the bloody clothing which defendant had discarded earlier in and around Lake Martin. Boyd testified that the St. Martin Sheriff's office communicated with the Nashville, Tennessee authorities to inform them that a subject wanted in connection with a murder was seeking a money wire at a Nashville Western Union office. Both Detectives Boyd and Guidry were present when defendant gave his videotaped confessions to the Blanchard murder and the Badon attempted murder. The detective testified about advising defendant of his rights per Miranda, and that defendant understood and freely waived those rights. Through these witnesses the state introduced both of defendant's videotaped confessions and the transcripts of each. The state then played for the jury the videotape of each confession.
The eighth and final witness to testify about defendant's unadjudicated criminal *794 conduct was Linda Badon. By agreement between the state and the defense, the state questioned Mrs. Badon in a leading fashion so as not to present any inflammatory discourse by the witness. Through Mrs. Badon's testimony, the state established the events of defendant coming to her house seeking his W-2 form and then questioning her about money. Mrs. Badon related how defendant kept stabbing her, as she fought for her life. She also told how after defendant left, she struggled out of her house and tried to start her car, which would not start, so she proceeded to walk down her driveway toward the road to get help. At that point, defendant came back toward her in the blue Thunderbird and to avoid him she cut across the field. However, defendant sped up and drove through the fence to hit her, sending her flying further into the field. She testified that defendant then struck her repeatedly about the face and body with the tire tool saying, "You got to die, Bitch." Mrs. Badon described her injuries, including a crushed skull and left jaw, requiring reconstructive surgery all over her face and head, blindness in her left eye, scarring from the 29 stab wounds, and a crippled right hand caused by defensive wounds. She then positively identified defendant in court and the state rested its case. Following Mrs. Badon's testimony, defense counsel moved for a mistrial based on "the testimony that she gave" as exceeding the bounds of Brooks. The trial court promptly denied the motion.
In analyzing whether the state injected an arbitrary factor into the penalty phase of the Mr. Blanchard's murder by introducing evidence of the unadjudicated attempted murder of Linda Badon, based upon the new standard set forth in Comeaux, this evidence does not inject an arbitrary factor. Although the state exceeded its own proffer of one officer plus defendant's confession which the judge ruled admissible pretrial, the eight witnesses that testified did not constitute a "prohibited mini-trial." See also State v. Robertson, 97-0177 (La.3/4/98); 712 So.2d 8 (permitting both victims to testify at penalty phase to defendant's previous criminal conduct did not violate any Jackson limitation allowing either "testimony of the victim or of any eyewitness to the crime"). The evidence presented was highly relevant to defendant's character and propensity toward robbery and arbitrary acts of extreme violence. Additionally, the two incidents were linked through the same weapon, the kitchen knife used to stab both Mr. Blanchard and Mrs. Badon. Furthermore, the trial court and the state took great strides to limit the testimony surrounding the Badon incident and agreed to present no photographs from that offense. Moreover, the jury heard and saw defendant's videotaped confession describing the Badon incident, which he also touched on in his direct testimony at trial in the defense's case-in-chief. Pursuant to Comeaux, the evidence of unadjudicated criminal conducted presented did not inject an arbitrary factor into defendant's penalty phase by impermissibly shifting the jury's focus from considering the character and propensities of the defendant to a determination of guilt or innocence in the Badon incident. Accordingly, this assignment lacks merit.

Assignment of Error No. III
Defendant further claims that the trial court erred in overruling defense objections to the admissibility of certain state's exhibits which were photographs of the deceased "as he was dredged up from his watery grave" and of his autopsy.[15] Although *795 not briefed, counsel points specifically to state's exhibit numbers 20, 21, 22, 23, 26-A, 27, 28.[16] Outside the presence of the jury, counsel stated his grounds for objecting to the photographs as being too gruesome and that they were irrelevant to any issue being contested in the penalty phase.
The state is entitled to the moral force of its evidence and postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location, placement of wounds, as well as to provide positive identification of the victim. State v. Koon, 96-1208, (La.5/20/97); 704 So.2d 756; State v. Maxie, 93-2158, (La.4/10/95); 653 So.2d 526; State v. Martin, 93-0285, (La.10/17/94); 645 So.2d 190. Photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient evidence, i.e., when the prejudicial effect of the photographs substantially outweighs their probative value. State v. Perry, 502 So.2d 543, 558-59 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987).
In the instant case, the first photograph about which defendant complains, S-20, was admitted over defense objection during the testimony of the victim's daughter, Sonia Blanchard. The state offered S-20, which depicted Mr. Blanchard after his body was located. Although his face was bloodied, his daughter was able to identify her father's facial features through the picture, and also testified that he was wearing the jacket that he always wore.
The remaining photographs complained of were admitted during the testimony of a detective with the St. Martin Sheriff's office, Scott Haydel. Detective Haydel is the dive rescue specialist who located Mr. Blanchard's truck at the Stafford Melancon Landing. Using the scene photographs, he was able to testify that the pictures fairly and accurately depicted the condition of the body once the truck was winched up from a depth of approximately 25-30 feet and the body was discovered within. Additionally, he works as a coroner's assistant and in that capacity, he photographed Mr. Blanchard's body during autopsy to record the various wounds to the body.
A review of the complained of photographs reveals that none is particularly gruesome. In addition, the scene photographs are relevant to depict how defendant left the body and the autopsy photographs are relevant to illustrate the number and location of stab wounds to the victim. As such, the probative value of the photographs outweighed any prejudicial effect. La.C.E. art. 403. The trial judge therefore did not err in ruling that the photographs were "not illegally gruesome" and could therefore be admitted. This assignment of error lacks merit.

Assignment of Error No. IV
Defendant asserts that the trial court erred in allowing the state to present improper rebuttal testimony through state witness Wilbert St. Julien, relating to evidence of other crimes on the part of the defendant, and in denying the motion for mistrial regarding this evidence. On cross-examination, the prosecutor asked defendant's brother, Frem Sonnier, whether he was aware of any problem defendant had ever had with Wilbert St. Julien, to which Mr. Sonnier responded that he was not aware of any problem.
*796 The same type of character questions were elicited by counsel of the next witness, Ernestine Sonnier, defendant's niece. Again, on cross-examination the prosecutor asked Ms. Sonnier if she knew about a problem defendant and Wilbert St. Julien had over defendant's former girlfriend, Peggy Broussard. Before the witness could respond, counsel moved for a mistrial claiming the state made an indirect reference to unadjudicated crimes.[17] Outside the presence of the jury, counsel informed the court that the prosecutor was introducing evidence of unadjudicated other crimes, specifically when "Ronald was in an intoxicated state and accused Wilbert St. Julien of messing with Peggy, and Ronald beat him up, put him in the hospital." The trial judge denied the motion for mistrial on grounds that the witness did not answer the question and thus the jury did not hear the objected to other crimes evidence at that point. After lengthy wrangling over the propriety of questions of the defense character witnesses about the St. Julien incident, a proffer of St. Julien's testimony outside of the jury's presence, and an overnight recess during which the trial court studied the applicable jurisprudence, the state agreed not to question the two remaining defense character witnesses about their knowledge of the incident. In turn, the court ruled that the state could present St. Julien's testimony during its rebuttal case.
As a general matter, in the bifurcated sentencing phase of a first degree murder trial, the character of the defendant is automatically at issue, whether the defendant has placed his character at issue or not. State v. Bourque, 622 So.2d 198; State v. Jackson, 608 So.2d 949, 953; La.C.Cr.P. art. 905.2. Evidence of unadjudicated other crimes is relevant and probative evidence of the defendant's character and propensities. Jackson, 608 So.2d at 954-56; Brooks, 541 So.2d at 813.
Normally, notice and a determination by the trial court that the evidence is admissible are required before evidence of unadjudicated crimes is permitted. However, Jackson indicates that these evidentiary limitations are not applicable to the state's case in rebuttal. In Jackson this court noted that if the accused introduces evidence in the penalty phase relating to his good character or lack of criminal history, the prosecutor may introduce appropriate and relevant rebuttal evidence. Jackson, 608 So.2d at 954, n. 6.
In the instant case, the state argued that counsel's questions to defense witnesses about whether they ever knew defendant to be a violent person opened the door. Under State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158, this Court reemphasized that the Jackson limitations on admissibility of unrelated conduct in the penalty phase, apply only to the state's case-in-chief, not to relevant rebuttal evidence, recognizing that "neither law nor justice permits a defendant to foist a spurious reputation upon a jury because the state is so limited in its cross-examination of the character witnesses." Sepulvado, 672 So.2d at 165, 166.
In the instant case, outside the presence of the jury, the state proffered the testimony of Wilbert St. Julien so that the trial court could make a ruling as to whether it would permit the state to call him as a rebuttal witness under Sepulvado and State v. Johnson, 389 So.2d 372 (La. 1980).[18] Following the proffer, the trial *797 court ruled that the evidence met the threshold of Johnson and could be used as rebuttal under Sepulvado.
After the defense rested its case, the state recalled Wilbert St. Julien as its only rebuttal witness. St. Julien testified similarly to his proffer made outside the jury's presence, and told the jury about an incident in July, 1995 in which he was spending the night at the home of defendant and Peggy Broussard, defendant's girlfriend at the time. St. Julien testified that the three had shared about a case and a half of beer and that at about 3:00 a.m. he was asleep on the floor when he overheard an argument between defendant and Peggy and then defendant came in attacked St. Julien by stomping on his face and beating him with a curtain rod until he was unconscious. St. Julien was hospitalized for five days as a result of the attack and had to have surgery on his broken jaw. St. Julien admitted that the attack was precipitated by defendant learning about a sexual encounter between St. Julien and Peggy Broussard.
The trial court properly admitted the evidence of the unadjudicated other crimes stemming from the battery upon Wilbert St. Julien according to the dictates of Sepulvado and Johnson and only after the defense presented four character witnesses who each declared that they knew nothing of defendant's violent nature. In rebuttal, the state was entitled to contradict defense assertions of nonviolent character with previous incidents without running afoul of Jackson. The state could present extrinsic evidence of a specific act of misconduct (involving violence to the person) in rebuttal of the defendant's character evidence because of the special rules governing character and propensity evidence in a capital sentencing hearing.[19] Moreover, the incident involving the St. Julien beating was not so detailed *798 as to interject an arbitrary factor into the proceedings and the trial judge correctly denied the defense motion for mistrial on this issue. This assignment lacks merit.

CAPITAL SENTENCE REVIEW
Pursuant to La.C.Cr.P. art. 905.9 and Louisiana Supreme Court Rule 28, this Court reviews every sentence of death to determine if it is constitutionally excessive. In making the determination, the Court considers whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; whether the evidence supports the jury's findings of the statutory aggravating circumstances; and, whether the sentence is disproportionate considering both the offense and the offender. In the instant case, the district judge submitted a Uniform Capital Sentence Report and the Department of Public Safety and Correction submitted a Capital Sentence Investigation Report. In addition, both the state and defense submitted a capital sentence review memorandum.
Defendant, Ronald James Letulier, a white male, was 32 years of age at the time of the commission of the murder of Wilmer Blanchard, Sr., an 85-year-old white male. Defendant completed the ninth grade in school and subsequently obtained his GED. His IQ is in the medium range of 70-100. He worked sporadically as a farm laborer and performed seismic work in oil and gas exploration. He was raised for the most part by his older sister because his mother was an alcoholic and his father died in a car accident when defendant was about 2 years old. Evidence further suggested that defendant was also injured in that same wreck and hospitalized with a fractured skull requiring several operations.
Defendant acknowledged that his criminal history began as a juvenile when he was convicted of burglary of a camp in St. Martin Parish and placed on probation. As an adult, defendant pled guilty in 1989 to possession with intent to distribute marijuana and was sentenced to serve two and one half years imprisonment at hard labor. He was released on parole and while on parole was arrested on charges of unauthorized entry of an inhabited dwelling, attempted simple rape, criminal trespass, and aggravated burglary. Pursuant to a plea agreement, defendant pled guilty in 1990 to simple burglary and was sentenced to seven years imprisonment at hard labor. He was released in September, 1994.[20]
While in St. Martin Parish jail, defendant met Stephanie King, who was serving time on a marijuana and cocaine charge. Defendant and Stephanie married in November, 1995, after they were released. Defendant urges that he committed these crimes because of his addiction to crack cocaine. However, on cross-examination, he admitted that he understood what he was doing when he murdered Mr. Blanchard and that drugs did not affect his mental state.

(A) Passion, Prejudice or any other Arbitrary Factors
In his capital sentence review memorandum, counsel claims he "feels strongly that an arbitrary factor was injected in the proceedings as discussed in the argument to assignment of error number two." This claim, as well as unargued assignments numbers three and four, were treated and disposed of under the individual assignments of error.

(B) Statutory Aggravating Circumstances
The jury returned all aggravating circumstances urged by the state: 1) that the offender was engaged in the perpetration or attempted perpetration of an armed robbery; 2) that the offense was committed in an especially heinous, atrocious, and cruel manner, and; 3) that the victim was older than 65 years of age.
The first and third aggravating circumstances were conceded by defendant both in his guilty plea and by counsel in his closing argument. The evidence presented *799 by the state as well as defendant's own testimony adequately supports the jury's findings on these two aggravating circumstances.[21] However, counsel disputes that sufficient evidence supports the jury's finding that the murder of Mr. Blanchard was committed in an especially heinous, atrocious or cruel manner.
When one aggravating circumstance is upheld on review, the failure of another aggravating circumstance will not invalidate the death penalty, unless it can be shown that the evidence of the unproven circumstance injected an arbitrary factor into the proceedings. State v. Taylor, 93-2201, (La.2/28/96), 669 So.2d 364, 382, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996). We find it unnecessary to consider whether the "heinous, atrocious and cruel" circumstances was sufficiently proven because we have determined that no arbitrary factor was injected by the evidence. Also, the remaining aggravating circumstances are more than amply supported.

(C) Proportionality
Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990). This Court, however, has vacated only one capital sentence on the ground that it was disproportionate to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1, 7 (La.1979).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d 1.
According to the state's Sentence Review Memorandum, in the 16th Judicial District, since January 1, 1976, sentence was imposed in 37 first degree murder cases, excluding the instant case. Of the 37, the jury returned the death sentence in five cases. None resembles this case closely. In Sonnier, defendant Eddie James Sonnier and his brother, Elmo Patrick Sonnier,[22] were tried separately and each found guilty of two counts of first degree murder and sentenced to death after abducting a teenage couple, raping the female victim, then shooting the victims three times each in the back of the head. The evidence indicated that Elmo was the triggerman. As noted above, this Court vacated Eddie Sonnier's death sentence and he is currently serving a life sentence. After a second penalty hearing, Elmo Sonnier was sentenced to death on both counts and has been executed.
In State v. Welcome, 458 So.2d 1235 (La.1983), defendant's convictions and sentences for the first degree murder of Dorothy Guillory and Wallace Maturin were affirmed. The defendant and Maturin got into an argument over a knife, the defendant shot and killed Maturin, re-loaded his pistol and then chased Guillory down the street and killed her. He received a life sentence for killing Maturin, and the death penalty for killing Guillory.
In Bourque, we affirmed the defendant's conviction but reversed his death sentence.[23] Bourque was quickly retried and *800 once again received the death penalty. In State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810, the Court affirmed defendant's conviction and death sentence in the stabbing murder of a nine-year-old boy. Defendant, a Sunday school teacher, sodomized the victim at a church picnic before killing him. In seven other capital prosecutions in the 16th JDC, juries returned sentences of life imprisonment.[24]
Given the scarcity of comparable cases in St. Martin Parish, it is appropriate for this Court to look beyond the judicial district in which sentence was imposed and conduct the proportionality review on a state-wide basis. State v. Davis, 92-1623, (La.5/23/94); 637 So.2d 1012. A state-wide review of cases, for example, reflects that jurors often return the death penalty when innocent adult victims have been robbed or raped and murdered in or near their home or car. The following cases, in which this Court affirmed the convictions and death sentences, involve murders of elderly victims. See Robertson, 712 So.2d 8, (defendant savagely stabbed an elderly couple to death during robbery in their home; victims were 76 and 71); State v. Tart, 93-0772 (La.2/9/96); 672 So.2d 116 (defendant bound and repeatedly stabbed elderly couple to death during robbery in their home; victims were 70 and 66); State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991) (defendant shot couple, age 65 and 56, in their home during an armed robbery); State v. Eaton, 524 So.2d 1194 (La.1988) (defendant plotted and laid in wait to steal female minister's car and repeatedly stabbed her after raping her); State v. Wingo, 457 So.2d 1159 (La.1984) (defendant and co-defendant escaped from jail, burglarized the home of an elderly couple, shot each victim in the back of the head, and robbed them, taking their car); State v. Glass, 455 So.2d 659 (La.1984) (same; co-defendant of Wingo); State v. Celestine, 443 So.2d 1091 (La.1983) (defendant strangled an 81-year-old woman in her home during an aggravated rape); State v. Narcisse, 426 So.2d 118 (La.1983) (defendant repeatedly stabbed a 74-year-old woman during an armed robbery in her home). Compared to these cases, it cannot be said that the death sentence in this case is disproportionate.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for *801 all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La. Rev.Stat. 15:567, until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
NOTES
[*] Victory, J., not on panel. See Rule IV, Part 2, § 3.
[1] Co-defendant has yet to be tried for Mr. Blanchard's murder.
[2] Defendant is the first to have pled guilty under La.C.Cr.P. art. 557 since it was amended by Acts 1995, No. 434, § 1, which now provides as follows:

A court shall not receive an unqualified plea of guilty in a capital case. However, with the consent of the court and the state, a defendant may plead guilty with the stipulation either that the court shall impose a sentence of life imprisonment without benefit of probation, parole, or suspension of sentence without conducting a sentencing hearing, or that the court shall impanel a jury for the purpose of conducting a hearing to determine the issue of penalty in accordance with the applicable provisions of this Code.
[3] The trial judge sentenced defendant to consecutive terms as follows: 50 years imprisonment at hard labor "without benefit" on the attempted second degree murder conviction; 99 years imprisonment at hard labor "without benefit" on the armed robbery conviction, and; 15 years imprisonment at hard labor on the simple arson conviction.
[4] Defendant admitted at trial that at the point he instructed Stephanie to follow the truck up the levee, he knew he was going to rob and kill someone.
[5] The forensic pathologist's autopsy protocol classifies the chest wounds and the stab wound to the temple all as lethal injuries.
[6] It was the same knife used to kill Wilmer Blanchard, Sr., the day before.
[7] Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).
[8] La.C.Cr.P. art. 797 provides in pertinent part that the state or the defendant may challenge a juror for cause on the ground that:

(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, is reasonable to conclude that it would influence the juror in arriving at a verdict.
La.C.Cr.P. art. 798 provides:
It is good cause for challenge on the part of the state, but not on the part of defendant, that:
(1) The juror is biased against the enforcement of the statute charged to have been violated, or is of the fixed opinion that the statute is invalid or unconstitutional;
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:
(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; or
(c) That his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; or
(3) The juror would not convict upon circumstantial evidence.
[9] This case also incorporated the three-pronged test from Brooks. Jackson, 608 So.2d at 956.
[10] On the same day that the Court rendered its decision in Comeaux, the Court affirmed Scott Jude Bourque's death sentence following his second penalty hearing. State v. Bourque, 96-0842 (La.7/1/97), 699 So.2d 1 (Bourque II). Adam Comeaux's case was tried before the first Bourque decision was rendered. Comeaux, 93-2729, p. 6. Similarly, in the instant case, the state's brief points out that defendant's guilty plea and capital sentencing hearing occurred after this Court's decision in Bourque but before Comeaux and Bourque II. Additionally, the prosecutors were sensitized to the issue of quantum of evidence and "prohibited mini-trial" as they were the same prosecutors who tried Bourque and Bourque II.
[11] On direct review, this Court affirmed Comeaux's first degree murder conviction but reversed his death sentence and remanded for a new penalty hearing. State v. Comeaux, 514 So.2d 84 (La.1987). At the retrial of his penalty phase, the state presented 23 witnesses, of which 11 testified about the instant double murder. The remaining 12 witnesses testified about other crimes. A separate jury returned the death sentence and this Court affirmed.
[12] The prosecutor supported his position to call Mrs. Badon to the stand based on State v. Brooks, 92-3331, (La.1/1/7/95); 648 So.2d 366, 376 (Brooks II).
[13] The state and the defense stipulated that the tire tool found by Mr. Decoux was the tire tool used by defendant during the attempted murder of Mrs. Badon.
[14] Both of these witnesses investigated both the disappearance of Wilmer Blanchard, Sr. and the attempted murder, armed robbery, and arson that comprised the Badon incident. Both matters came to the attention of the sheriff's office on February 6, 1996. Accordingly, in light of the fact that defendant obviated the need for a guilt phase by his guilty plea, both Detectives Boyd and Guidry testified not only about the unadjudicated Badon incident, but also as to their participation in the investigation of the capital murder for which the jury was called to determine the sentence.
[15] The only exhibits referenced in this unbriefed assignment relate to the deceased victim, Wilmer Blanchard, Sr. The jury was never presented photographs of Linda Badon, the attempted murder victim, pursuant to an agreement between the state and defense counsel. State's exhibit numbers 42, 43, and 44, which depict Mrs. Badon as she was found in the field by State Trooper John Childers, were originally offered by the state to facilitate the testimony of Trooper Childers, but were never displayed to the jury. By agreement between the state and defense, the state introduced S-42, 43, and 44 for record purposes only and not for presentation to the jury, even should the jurors request to see them.
[16] Notably, the prosecutor showed defense counsel all of the photographs before trial and counsel indicated that the only picture he objected to was S-26. At trial, counsel conceded his initial acquiescence, but admitted that in representing defendant to the best of his ability, he felt he should now object to the photos on grounds of gruesomeness and relevance. Nevertheless, even after the court admitted all the photographs, the prosecutor offered S-26 for record purposes only and not to be displayed to the jury, in accordance with the original agreement with the defense.
[17] Defense counsel also argued that the state's questioning about unadjudicated other crimes violated the notice requirement of Jackson because the pretrial disclosure by the state indicated that the Linda Badon incident would be the only evidence of unadjudicated criminal conduct introduced. Counsel argued that he relied on the state's disclosure in good faith and planned his defense strategy accordingly. He objected that, in his view, the state reneged on its earlier assurances.
[18] In State v. Johnson, 389 So.2d 372 (La. 1980), this Court set forth safeguards regarding impeachment of character witnesses with particular instances of misconduct. Under Johnson, the court should make a preliminary inquiry out of the presence of the jury and satisfy itself that: (1) there is no question as to the fact of the misconduct by the defendant; (2) a reasonable likelihood exists that the misconduct would have been known in the community prior to the alleged commission of the offense on trial; (3) neither the event or conduct occurred at a time too remote from the present offense; (4) the prior misconduct concerned the specific traits involved in the offenses for which the accused is on trial; and (5) the examination will be conducted in the proper form which is "Have you heard ...". Johnson, 389 So.2d at 376.
[19] Whether offered by the accused as evidence of a pertinent moral quality or by any party to impeach the credibility of a witness, character is generally proved (only) by evidence of the person's reputation in the community. La.C.E. art. 405(A) ("Except as provided in Article 412, in all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to general reputation only."); La.C.E. art. 608(A) ("The credibility of a witness may be attacked or supported by evidence in the form of general reputation only...."). The opposing party may nevertheless cross-examine the witness as to his knowledge of specific bad acts of the accused or another witness. La.C.E. art. 405(A); 608(C). State v. Bagley, 378 So.2d 1356, 1358 (La.1979) ("The purpose of such inquiries is to expose the witnesses' possible lack of knowledge regarding the character of the defendant, or the witnesses' standard of evaluation.") Except for cases in which character is an essential element of the offense, La.C.E. art. 405(B), however, the party may not present extrinsic evidence of specific instances of bad conduct. La.C.E. art. 404(A) and Cmt. ("With the exception noted in Paragraph B, character may not be established by proof of specific instances."); art. 608(B) ("Particular acts, vices or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness....").

These general rules reflect a venerable tradition in the common law, see Michelson v. United States, 335 U.S. 469, 475-79, 69 S.Ct. 213, 218-220, 93 L.Ed. 168 (1948), but they do not apply to a capital sentencing hearing which focuses primarily and exclusively on the character and propensities of the defendant. As discussed in text, and subject to the limitations imposed by Jackson, the state has the right to present extrinsic evidence of the defendant's prior bad acts or courses of conduct to prove his "character" before, and without regard to whether, the defendant presents evidence of his good character. The state's rebuttal case accordingly may encompass extrinsic evidence of other bad acts as well as the more traditional reputation testimony in response to an affirmative defense case regarding the good character of the defendant.
[20] Defendant was on parole at the time he committed the instant offenses.
[21] Besides defendant's confession and admission at trial that he robbed Mr. Blanchard, the state introduced testimony from a bank representative that Mr. Blanchard had cashed two Social Security checks and did not maintain a checking account. The victim's son testified that his father always carried cash. When Mr. Blanchard's body was recovered, only 27 cents was found on his person.

As evidence of his age, Mr. Blanchard's baptismal certificate was introduced which reflects his date of birth as March 10, 1910.
[22] State v. Sonnier, 379 So.2d 1336 (La.1979).
[23] This case was previously discussed in defendant's third assignment of error.
[24] State v. Frank Bennett, Docket No. 94781, St. Mary Parish: The defendant had an argument with a member of his household who put him out of the house and forced him to sleep in the washateria. The next day he purchased a handgun, went to the residence, fired the gun in the air, and beat the victim with the gun. When she ran out of the residence, he shot her, and she died immediately. Bennett stated that he checked the victim's body to see if she was dead; he told police that he would have shot her again if she were alive.

State v. David Jon Liner, 397 So.2d 506 (La.1981), St. Mary Parish: The defendant was convicted in the death of Roxanne Barrilleaux. The victim's father took the stand and requested that the jury not recommend the death penalty.
State v. Carey Lasseigne, Docket No. 63577, St. Martin Parish: The defendant, armed with a .22 caliber pistol, robbed a gas station and shot the attendant two times in the back of the head.
State v. Dannie K. Johnson, Docket No. 33531, Iberia Parish: The defendant shot and killed a store employee while attempting to escape from a shop-lifting detention. He wounded two other employees.
State v. Ray Sampy, Docket No. 39744, Iberia Parish: The defendant and a co-defendant kidnapped the victim and drove him to a deserted area where they bludgeoned him with a hammer, and ran over him with a car. They stole the car after the murder.
State v. Charles Arnold, Docket No. 42105, Iberia Parish: The defendant shot and killed his wife at their home. He then went and picked up the second victim (whom he later shot) and brought him back to the house so that he could make him look like the perpetrator.
State v. Eddie James Sonnier, 380 So.2d 1 (La.1979): As discussed in text, the defendant was convicted of first degree murder, and received the death sentence. However, on appeal, this Court found the sentence to be excessive, and remanded for re-sentencing to life imprisonment.