809 So.2d 1093 (2002)
STATE of Louisiana
v.
Justin E. HUCKABAY, II.
No. 2000-KA-1082.
Court of Appeal of Louisiana, Fourth Circuit.
February 6, 2002.
*1095 Harry F. Connick, District Attorney, Anne M. Dickerson, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Ralph S. Whalen, Jr., New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge JOAN BERNARD ARMSTRONG, Judge STEVEN R. PLOTKIN, Judge TERRI F. LOVE).
Judge STEVEN R. PLOTKIN.
There are multiple issues in this appeal of a second degree murder conviction. The first relates to jury selection; the second to rulings on evidence during the trial and the final one to the sufficiency of the evidence.

PROCEDURAL HISTORY
Defendant, Justin Huckabay, was charged by a grand jury indictment with the November 8, 1995 first degree murder of Michael Vasquez, in violation of La. R.S. 14:30.[1] Defendant was tried by a twelveperson *1096 jury and found guilty of second degree murder. The trial court denied defendant's motion for new trial. Defendant waived legal delays and was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.

STATEMENT OF FACTS
New Orleans Police Officer Terry Thomas testified that on November 8, 1995, at approximately 4:20 a.m., he and his partner responded to a citizen report of a person lying on the sidewalk at the intersection of Chestnut and Josephine Streets. The individual, who was not moving and did not appear to be breathing, was bleeding profusely from a large open wound on his head. New Orleans Police Homicide Det. John Ronquillo investigated the homicide. There was a plastic bag over the feet of the victim, and the body was wrapped in a brown blanket and a beige comforter, with an electrical cord wrapped around the neck. Det. Ronquillo said the brown blanket had a great deal of white or gray hairs on it, like animal or cat hairs. When the outer coverings were removed, a rope was discovered wrapped around the victim's neck, with significant markings on the neck. The victim was wearing a pair of purple multi-colored swim trunks, and a blood-stained polo shirt was found at the scene. Det. Ronquillo later described the victim as five feet one inches tall, weighing one hundred and thirty pounds. There was no identification on the body.
On November 14, 1995, one of the victim's former co-workers at Choice Couriers contacted police after reading a newspaper article about the discovery of the body. That person identified the victim and the detectives learned that the victim had resided at 1431 St. Andrew Street, Apartment 6. Detectives discovered that the victim had not paid rent there for a week, and had partially moved out. The detectives subpoenaed utility records and learned that the victim had registered for utilities at 2033 Coliseum Street, Apartment 2. Det. Ronquillo and his partner, Det. Joseph Waguespack, went to that location on November 21, 1995, around 12:30 a.m. A male, later determined to be defendant, came to a window and left. The detectives knocked on a door, which was answered by Linda Sunell. Inside of the apartment were defendant and Kathleen Green, Sunell's fourteen-year old daughter. Defendant said that the three of them had lived with the victim on St. Andrew Street, before moving to the Coliseum Street apartment. Defendant said the last time he saw the victim was on November 11, when the victim had left to spend time with his girlfriend. Linda Sunell and Kathleen Green relayed essentially the same facts to the detectives. As the detectives were preparing to leave, Det. Ronquillo noticed what appeared to be a blood stain on the wooden arm of a sofa.
Det. Ronquillo obtained a search warrant for the apartment, which he executed on November 29 with another detective, a criminalist, and a forensic light examiner. Ms. Sunell answered the door. Det. Ronquillo said that when he and Det. Waguespack had gone to the apartment on November 21, it was filthy. He said it was obvious that the apartment had been cleaned. There were gouges in the sheetrock that looked as if they had been made by a knife or other instrument, and Det. Ronquillo said there was blood in the gouges. A piece of the sheetrock was removed from the wall for evidence. Det. Ronquillo said blood was still on the wooden arm of the sofa. There was also blood underneath the sofa cushions, and a large clump of black hair, similar to that of the victim. There was blood on the lining of *1097 the sofa, indicating that bloody cushions simply had been turned over. The cushions were confiscated, as was the lining. The wooden arm of the sofa was collected as evidence. Samples were taken of suspected blood stains everywhere. The floor had been cleaned up to point where some bicycles were located, but when those were moved, blood stains were discovered on the floor. Samples of these stains were collected, as were some of the floor tiles. A piece of a door was taken, as were a pair of size 12 Nike tennis shoes, with one shoe stained with blood. Some white plastic garbage bags similar to the one that had covered the victim's feet were recovered, as well as a piece of rope. Detectives removed some blood stained floor tiles from a bedroom, and a knife and a meat cleaver from the kitchen. Det. Ronquillo noted a police photograph of the apartment showing a grayish-white cat inside, looking out.
On November 29, 1995, the date the search warrant was executed, Linda Sunell and Kathleen Green were arrested. Defendant came to the homicide bureau that afternoon and gave a taped statement after being advised of his Miranda rights. That statement was played for the jury. In his scattered and rambling statement, defendant, then twenty years old, indicated that he did not move into the Coliseum Street apartment until after the victim's death. He later said that he never really moved in, but that he might have spent a night or two there. He claimed to have stayed with a number of different people. He knew the victim, and said the victim had moved in with Linda Sunell and her daughter Kathleen Green for a couple of days. Defendant said he met Sunell and Miss Green at the Hummingbird Grill; they had just arrived in town and were looking for a place to stay. Defendant was then living at the Hummingbird with Angie McGinnis. Defendant said that sometime after Sunell and Ms. Green moved in with the victim, he saw Sunell, who told him that the victim was gone. Sunell wanted defendant to come over "to help them get out or get Michael [sic] stuff together in case he came to get it, or if he was killed or what, [sic]...."
The two females asked defendant if they should file a missing person report. Defendant said he figured the victim had gone to stay with a girlfriend. He did not know her name or where she lived. When asked whether he knew if the victim had any enemies, defendant said no. Defendant said he did not know whether the victim and Sunell had a romantic relationship, but that there was nothing between the victim and Green, as he would have known that. Defendant said Green was his girlfriend, but that he had not had intercourse with her because she was only fourteen. Defendant stated he had pretty much been living at the Coliseum Street apartment since the victim left. Defendant denied killing the victim or knowing who did. He said he knew how the victim was killed because a lady next door told him that the victim had been beaten, strangled and wrapped up in a sheet.
Det. Ronquillo testified that blood was drawn from defendant, Sunell and Miss Green while they were in custody, on December 6, 1995. That blood was not submitted to the FBI for DNA analysis until May 1998, and the results did not come back until February 1999. On April 2, 1998, Det. Ronquillo was contacted by Det. Ron Eddington, of the Picayune Police Department in Mississippi. Det. Eddington advised him that Kathleen Green, by then seventeen years old, had been found in a vehicle with Raymond Johnson, who was arrested on outstanding warrants from Arkansas. Miss Green was made a ward of the State of Mississippi, and placed in Pine Grove Medical Center. Miss Green confided to a social worker *1098 that she knew details of a murder in New Orleans involving a friend of hers named Michael. Det. Ronquillo took a statement from Miss Green on May 11, 1998 at the Pine Grove Medical Center, which differed from the statement she had given in November 1995. Based on that statement, a grand jury indicted defendant and Linda Sunell for the first degree murder of Michael Vasquez.
Det. Ronquillo subsequently arrested defendant at a French Market stand operated by defendant and his wife, Elizabeth. Defendant was advised of his rights, and he said that he did not kill anyone. Defendant told the officers he did not recall what he said in his November 1995 statement, but that he stood by it. During a subsequent search of defendant's residence, at 8863 Highway 23, in Belle Chasse, Louisiana, officers seized a machete-type knife with a brown handle and a blade of sixteen and one quarter inches in length, along with a scabbard. Det. Ronquillo said he had continued to search for Linda Sunell, without success.
Det. Ronquillo testified on cross-examination that his report reflected that Dr. McGarey, a coroner, mentioned to him that certain wounds were caused by a meat cleaver. Det. Ronquillo said he did not know to whom the bloody size twelve Nike tennis shoes he recovered from 2033 Coliseum belonged. Det. Ronquillo believed that comparison tests between a meat cleaver and the gouges on the sheetrock wall of 2033 Coliseum Street were inconclusive. Det. Ronquillo admitted that defendant was uncertain of the date he last saw the victim when he made his November 1995 statement. However, Det. Ronquillo said defendant had told him on November 21 that he had last seen the victim two Saturdays ago, which Det. Ronquillo said would have been November 11. Det. Ronquillo testified that, although the tape recorder had been turned off, when he asked defendant in November 1995 about an axe and a knife, defendant said he had given the axe back to Mr. Howell, but that Linda Sunell and Miss Green must have hidden the knife.
It was stipulated that if called as a witness, Officer Timothy Seuzeneau would testify that he found no fingerprints on a "Kiwi" brand stainless steel knife with black plastic handles. A comparison between a meat cleaver and a knife to strike marks on a piece of sheetrock from 2033 Coliseum Street, Apartment 2, were inconclusive as to whether those items made the strike marks. It was further stipulated that if Joe Tafaro of the New Orleans Police Department Crime Lab was called as a witness, he would testify that a microscopic analysis showed that the fibers found on the machete and scabbard seized from defendant's residence were plant fibers, and the hairs found on those items were animal hairs.
Dr. Richard Tracey, who was qualified by stipulation as an expert in the field of forensic pathology, performed an autopsy on the body of the victim. The upper part of the body had numerous cuts scattered over it. There were no injuries on the legs or hips. There were several cuts with a heavy cutting instrument, such as a meat cleaver or an axe. There were cuts across the face, on the back of the head, down the length of the left arm and across the chest. There was a blunt force injury to the back of the head. The cause of death was strangulation by a rope wrapped three times around the neck. Dr. Tracey said several of the wounds were very deep, and that if left unattended, the victim might well have bled to death. He confirmed that an axe could have been the heavy instrument used to inflict some of the wounds, even the cutting wound to the left arm, but that a meat cleaver and a machete *1099 would be just as consistent with some of the cut wounds.
Dr. Tracey testified on cross examination that he collected fingernail clippings from the victim, but did not know whether any evidence such as blood or flesh of an attacker were found on the clippings. Dr. Tracey stated that both the blunt force and cutting injuries could have been made by a single instrument such as an axe, machete or meat cleaver. Dr. Tracey testified on redirect examination that blood and urine samples taken from the victim were negative for alcohol or street drugs. He also said blood covered the whole body of the victim.
Dr. Paul McGarey, qualified by stipulation as an expert in the field of forensic pathology, had reviewed autopsy photographs of the victim. He said the trauma wounds he observed in autopsy photographs were made by the blunt edge of an axe. He also confirmed that an axe with a good sharp edge could have made the cutting wounds, as could have a machete, meat cleaver or a knife. However, he did not believe that a blunt wound could have been made by a sharp edge instrument like a meat cleaver. Dr. McGarey admitted on cross examination that his opinion was based on his viewing of the autopsy photographs, and that he was not present during the autopsy. Dr. McGarey denied telling a coroner's office investigator that certain numbered wounds were caused by a meat cleaver.
New Orleans Police Department Criminalist Alan Sison was qualified by stipulation as an expert in the field of the microscopic comparison of hair and fiber. He confirmed that hairs do not possess a sufficient number of unique characteristics to be positively identified as having originated from a particular person to the exclusion of all others. Mr. Sison compared hairs taken from the victim, defendant, Linda Sunell and Miss Green to hairs found at the crime scene. Two hairs recovered from the comforter were similar to defendant's hair insofar as color and size. One was similar to the victim's. Mr. Sison did not find any of the other seven hairs recovered from the comforter to be similar to any of the four known samples. He found one hair taken from the sofa to be similar to the victim's hair. Mr. Sison confirmed on cross examination that he could not say that any hair similar to defendant's was found on the victim's body. However, he said there was hair on the body that was not similar to defendant's, Linda Sunell or Miss Green. He said he had five different slides of hair taken from the victim's body, but could not say how many different people the hairs were from. He did say that some of the hairs were identified as cat hair. One hair identified as having been collected from the victim's shorts was not similar to defendant's.
New Orleans Police Department Criminalist Karen Lewis Holmes, qualified by stipulation as an expert in the field of serology, testified that blood identified as being from defendant was group A. Blood identified as being from Linda Sunell was group B, and Kathleen Green's was group 0. Ms. Holmes testified that tests on bloodstains found on the victim's swimming trunks, the piece of rope found on the victim, two pieces of electrical cord, the blue shirt, and the comforter and the brown blanket all tested positive for group A. Ms. Holmes stated this meant that the victim also had group A blood; she later indicated on cross examination that she did not have a known sample of the victim's blood. Fingernail clippings from the victim's left hand tested positive for group A human blood. A stainless meat cleaver and knife removed from 2033 Coliseum Street, Apartment 2, tested negative for the presence of human blood. The blood stain on the size twelve Nike tennis shoes *1100 tested positive for human blood, but the amount was insufficient for blood grouping.
Ms. Holmes testified that a blood sample taken from a wall behind the sofa in the apartment tested for group A human blood, the same group as the victim, as well as defendant. The sample taken from a door in the apartment, near the door knob, was positive for group A human blood. However, Ms. Holmes said the blood on the piece of sheetrock taken from the apartment was human but inconclusive for grouping, as was blood on a piece of carpeting taken from the bedroom floor, a sample taken from the living room floor near the bedroom door, and the blood on two pieces of floor tile taken from the bedroom floor near the bed. Three blood stains from the sofa were positive for human blood, but inconclusive for grouping. However, the blood on a piece of the sofa lining and on the wood arm of the sofa were both positive for group A blood. Ms. Holmes testified under cross examination that she compared a piece of rope recovered from either the apartment or the victim, with a piece of rope from "Al's place of employment," but they did not match. Ms. Holmes estimated that fortyfive to fifty percent of the population had group A blood.
Results of the DNA analysis performed by FBI were stipulated to by the parties. It was stipulated that if Alan Giusti, a Crime Lab technician at the FBI Crime Laboratory in Washington, D.C., were called as a witness he would testify that blood samples from the victim's shorts found on his body at Josephine and Chestnut Streets, and the blanket that was covering his body when found there, were used as known blood samples from the victim for comparison purposes. It was further stipulated that the blood samples from the floor at 2033 Coliseum Street, Apartment 2, a sofa cushion found there, and the sheetrock there, were all the same DNA type as the blood of the victim. It was also stipulated that the blood samples of defendant, Linda Sunell and Kathleen Green were analyzed and found not to be the source of the blood samples from the floor, sheetrock, or sofa cushion.
Kathleen Green, then eighteen years old, testified that she was Linda Sunell's daughter. Miss Green said she was then living in Mississippi. When she was ten, her mother discovered that Kathleen's stepfather was abusing her, and the mother and daughter moved to Arizona. From the age of ten to fourteen, she and her mother traveled. They came to New Orleans in the spring of 1995 and they went to the Hummingbird Grill. A woman named Angie let them stay with her in the hotel, where they lived for a couple of months. There they met the defendant. Miss Green said she really did not like defendant at first, but later became friends with him, and eventually became his girlfriend. They planned to marry. She also knew defendant as Chester.
She met the victim through defendant, some two months after arriving in New Orleans. The victim offered to allow Miss Green and her mother to stay with him until they got on their feet. They lived with him in one apartment for three and one-half weeks. The victim said the apartment was too small, and so he got a larger one, on Coliseum Street. Defendant moved in with a duffel bag and a couple of pieces of his property. The victim slept on the sofa in the living room. Miss Green and defendant slept on the floor in the bedroom, while Linda Sunell slept in the bed there. Miss Green said a couple of weeks after they moved into the Coliseum Street apartment, she heard her mother and defendant discussing that the victim had a life insurance policy on himself. Linda Sunell believed she was the beneficiary. *1101 Miss Green indicated that as far as she knew, her mother and the victim were not boyfriend-girlfriend. Miss Green said that it was her mother, Linda Sunell, who came up with the plan to kill the victim and that defendant at first did not like the idea. The plan, which was to kill the victim with the axe while he was sleeping and dispose of his body in the river. Miss Green said defendant laughed about it before hand. In addition to Linda Sunell's belief that the victim had a life insurance policy benefiting her, Miss Green said her mother and defendant also believed defendant had cash hidden in the apartment, perhaps $800.
Miss Green testified that on the night of the murder, she, her mother and defendant were home. The victim got something to eat, and went to sleep around 10:30 p.m. Miss Green, her mother and defendant went to sleep about 10:45 p.m. The next thing she knew, her mother woke her up. Defendant was standing by the closet in the bedroom holding an axe; it had a three-foot long wooden handle, a red head, and a silver blade, with the other side being blunt. Defendant told her to stay in the room and plug her ears. She heard a thump. Her mother went into the living room and asked what happened, and defendant said he had struck the wall above the victim. She heard the victim ask defendant why he was doing it, and to tell him what he did wrong so he could rectify it. Linda Sunell went into the living room. Miss Green heard scuffling and went to the door, where she saw defendant and the victim going around in a circle like they were fighting each other. The axe was near a window, by a desk. The victim was bleeding from the back of his head, and was very distraught.
Miss Green said she was not sure how many times defendant hit the victim with the axe, or even if he hit him at all. All she remembered was that defendant started swinging at the victim. Defendant put the axe down again, and the victim tried to escape out the front door. Defendant grabbed him and the victim fell. Defendant got on top of the victim and tried strangling him. Linda Sunell was sitting on the sofa by that time. Miss Green said she was still standing by the bedroom door. Miss Green said defendant next tried to strangle the victim with something. The victim quit moving, and defendant told Sunell to check his pulse. Sunell did so, and said the victim did not have a pulse.
Miss Green said that one of them went into the bedroom to get a machete, with which they planned to dismember the victim. Miss Green said she went back into the bedroom and heard either her mother or defendant try to cut the victim with the machete, but it was too dull. The two gave up on that plan, and wrapped up the victim in a white garbage bag, telephone cord and three comforters. Miss Green said she did not help, and that she was in shock. She said she did not think they were really going to do it. Defendant and Sunell went into the bathroom to clean up. Defendant then picked up the victim's body and put it over his right shoulder. He planned to carry it to the levee. However, Miss Green said defendant carried the body for about two blocks, said it was too heavy, and dropped it on the sidewalk. They all went back to the house. Defendant and Sunell cleaned up the apartment with rags and soap and water.
Miss Green said she knew of the plan to kill the victim for about two weeks, but did not go to the police because she was afraid. They told her that if she said anything they would do the same thing to her. In the days following the killing, she asked them why they did it, and they said that if she, Miss Green, had not acted the way she did with the victim they would not *1102 have done it. Miss Green said defendant joked about it, saying that he bet the victim had a splitting headache and was feeling in pieces. Miss Green said that approximately one week after the murder, defendant and her mother searched in vain for the victim's money. They came up with a story for policethat the victim had reconciled with his Westbank girlfriend and had gone to stay with her for a few days. They would say that they had not seen the victim since he left.
Miss Green said that she was initially arrested in November 1995, sent to a juvenile facility, and then placed in a foster home. She went back to her mother after her mother's release from jail, and began traveling again. She did not see defendant after his release from jail. Two years prior to trial, she and her mother were traveling with a man named Ray. Miss Green said she got into an argument with her mother about her mother's use of drugs and alcohol, and she and Ray went to Arkansas by themselves. Ray was subsequently arrested when the two were in Mississippi, for possession of a stolen vehicle, stolen credit cards and stolen checks. Miss Green was placed in a group home, but attempted to commit suicide and was placed in Pine Grove Hospital, a mental institution. She began having nightmares and flashbacks about the murder, and confided it to a nurse. She said she felt guilty about the murder, because her mother and defendant told her they did it because she had been close to the victim. Det. Ronquillo subsequently came to see her, and she told him what had happened. Miss Green identified defendant in court as the person who killed Michael Vasquez.
Miss Green confirmed on cross examination that the life insurance policy angle did not make any sense. She admitted to using Demerol, crack, cocaine, marijuana, pills and whiskey in the past, and having been addicted to drugs and alcohol. She said she presently did not use drugs or drink. She said she was drinking and taking amphetamines in November 1995. She denied ever having hallucinated or ever having blacked out. She first sought substance abuse treatment when she was sixteen. Miss Green said she sometimes had seen the victim leave money at the apartment, in or on a desk. She said he never tried to hide it, and said she would have thought that defendant and her mother knew where it was.
Miss Green admitted originally telling police the lie about the victim and his girlfriend. No one had ever told her that she could be prosecuted as an accomplice to murder. She said she had no reason to believe that she would be prosecuted. Miss Green said she was being treated in the Mississippi mental hospital for bipolar manic depression, severe depression and blackouts. She was being treated with drug therapy, but she denied having received shock treatment therapy. Miss Green could not recall the name of the nurse to whom she first told the story of the murder.
Miss Green said she believed that she was no longer engaged to defendant at the time he committed the murder. She said they had lived together for two weeks before the murder. Confronted with her statement to Det. Ronquillo in May 1998 that the four of them lived together for close to six to seven months, a year at the longest, Miss Green said she was not sure how long it had been. Miss Green stated that she and her mother had cleaned up the apartment before police came the first time, on November 21. She answered no when asked if they attempted to clean it up again after the visit. However, defense counsel followed up by asking if they had cleaned it up right before the second visit by police, and she said they cleaned it up again because the police went through everything *1103 looking for something. She denied that the apartment was cleaned again using cleaning fluids. She admitted telling Det. Ronquillo that in order to cover up the blood on the sofa she simply threw a sheet over it and never made an attempt to remove it, even when the police came. Miss Green identified a letter in the notebook she had written to the victim. She wrote the letter to the victim contained in the notebook after the murder. She wrote it at the suggestion of defendant, to take away some the guilt. Miss Green admitted that her mother was dying from AIDS the last time she saw her, but denied that she would like to see her die out of jail instead of in jail.
Michael Howell testified that he knew defendant through his father and stepmother, who was the sister of defendant's wife. Michael Howell said that his son and daughter-in-law expressed an interest in buying the property with him. Michael Howell stated that when he informed defendant of this change in circumstances, defendant became angry, saying that he really wanted the piece of property. Defendant threatened Michael Howell, stating: "Look, if I have to take out your son to get it, that's what I will do. I have done it before and got away with it and I will do it again." Michael Howell said he socialized with defendant and his wife after this only a distance.
Charles Howell, Michael Howell's father, testified that he first came into contact with defendant in February 1995, when one of Mr. Howell's regular part time workers enlisted defendant to help build an addition onto the home of Mr. Howell's mother-in-law. Defendant bought an axe and a machete to help in clearing the land. Mr. Howell described the axe as a single-bit axe, flat on one side with a blade on the other, approximately three feet long. The machete was approximately sixteen inches long. Charles Howell said he picked up defendant for work every morning. Mr. Howell stated that defendant took his tools back and forth from his place of residence to work, sometimes taking both the axe and machete, sometime just one or the other. Mr. Howell saw defendant at his shop some months after defendant's release from jail, and defendant had an axe in his possession. Mr. Howell said it looked like the same axe defendant used to carry back and forth to work. Mr. Howell noticed that the axe had the word "Killer" written on it. Mr. Howell thought it was a joke. Mr. Howell said he knew there had been a crime but did not know anything else. Mr. Howell identified some rope taken from his residence during a search. Mr. Howell testified he did not think it was unusual for somebody to own an axe, and said that all five of them working to clear the land had axes and machetes. Mr. Howell admitted that defendant's father informed him a few weeks ago that defendant's nickname was "Killer."
Defendant testified in his own behalf. He was twenty-four years old at the time of trial, with a wife, a daughter and a four-month old son. Defendant said he met the victim, Michael Vasquez, at the Hummingbird Grill, where defendant was working as a busboy. Defendant said he did not kill the victim, and had nothing to do with it. He said he did not know how the victim died. He thought Linda Sunell and Kathleen Green did, but that they had never told him. Defendant denied living with Sunell, Miss Green and the victim, maintaining that he moved in with Sunell and Miss Green after the victim died. Defendant said that at the time he moved in he did not know the victim was dead. The two females asked him to move in with them. They told him that the victim may have had a fight with his girlfriend, and had left the apartment and not come back. Defendant explained that he had been living at the Hummingbird with Angie *1104 McGinnis, a waitress there, helping to take care of her son when he was not working.
Defendant testified that he was 6'4" tall and weighed 200 pounds. He said he used to be a little bigger then, as he had been doing heavy manual labor daily. He stated he would not have had been a problem carrying a 135 pound body for a distance. Defendant denied telling Det. Ronquillo that he had last seen the victim on November 11, 1995, and said he did not know when he last saw him. He also said he did not know exactly when he moved into the Coliseum Street apartment, but thought it was around the beginning of November. He admitted that he helped the trio move into the apartment and that he may have stayed there one night. He then said that maybe they had gone out and he ended up just staying there, indicating a second time. He had also visited the apartment. Defendant admitted owning an axe and said the machete belonged to him and his wife. Defense counsel noted that Miss Green testified that defendant and Linda Sunell had been unable to dismember the body of the victim, and asked defendant if it would have been difficult for someone of his size to break bones with an axe. Defendant replied that he did not think so. He said he had used the axe at the job site to cut down trees and chop through roots in the ground when digging a sewer line.
Defendant did not attempt to contact Linda Sunell and Kathleen Green after his release from jail because he had just gotten a job. He went to Gulfport, Mississippi and lived with his parents and worked in a casino. He had not attempted to hide from anyone. Defendant moved into Chuck Howell's home in October or November 1996. Defendant got married in October 1997, and had lived in Belle Chasse since then. He said his wife had a booth at the French Market, and that he helped her with it when he was not working on the river.
Defendant read a letter he wrote to Miss Green, in which he told her that he tried to stay his distance but that it was hard to do because he was a man and got horny. In another letter he wrote that he did not mean to carry it so far but that he gotten like a horny toad again. Defendant admitted that this meant that it had been a while since he had intercourse with a woman. When asked where he had slept on the occasions he stayed in the Coliseum Street apartment, defendant said he did not remember, but he knew that he had not slept with Linda Sunell or Miss Green. Defendant said the two women and the victim had asked him to move in with them, but he declined the invitation. He said his belongings were at the Coliseum Street apartment when he was living with Angie McGinnis because her room was small and there was not enough space, even for his small duffel bag.
Defendant denied telling Charles Howell that he was living with a man and two women. Defendant admitted staying at the Coliseum Street apartment off and on, but said he either did not know or did not remember how long he stayed there. When asked what the sleeping arrangements were at the apartment, defendant said that Linda Sunell and Kathleen Green slept in the bedroom and the victim slept on the couch. Defendant stated that he thought he had just slept on the floor when he stayed there. He said he did not remember where he kept his stuff there, but thought it had been in the closet. Defendant said he never noticed any stains on the sofa after he had moved into the apartment, explaining that he never examined it. Defendant denied taking his axe home at night with him and said Charles Howell was lying about defendant taking his axe and machete back and forth to work. He also said Mr. Howell lied when he said that the axe had the name "Killer" written on it. He denied showing Mr. Howell an *1105 axe after he was released from jail. When asked if there was a conspiracy against him and all of the other witnesses were lying, defendant said he guessed it was a conspiracy. On redirect examination, defendant replied he thought Charles Howell had been mistaken about the things he testified to, as opposed to lying. Defendant said he had never been arrested for anything other than traffic offenses.
Justin Edward Huckabay, defendant's father, testified that everyone liked defendant and that defendant had never been hot tempered. He said his son had a reputation for being a very truthful person, truthful to a fault sometimes. Elizabeth Grant Huckabay, defendant's wife, testified that when defendant was home from working offshore he would help her with her jewelry business in the French Market. She did not know defendant to have threatened Charles Howell. She also said that the defendant had a reputation for being peaceful and non-violent. Asked about his reputation for truthfulness, Mrs. Huckabay said it was impeccable.
Dave Cater testified that he had known defendant since August 1994. They both worked at the Times-Picayune newspaper, and later, for Charles Howell. The work for Mr. Howell involved clearing land and carrying heavy loads. Mr. Cater said that all of the tools they used belonged to Mr. Howell. During that period he never saw defendant with an axe or a machete. He said Mr. Howell had electrical stuff, including wire like a piece the prosecutor showed him.
Elizabeth Shelton, defendant's sister, and Roland Kay testified that defendant had a general reputation for being a truthful, peaceful and non-violent person. Elaine McNamara, defendant's mother, testified to the same effect. Ms. McNamara said defendant received the nickname "Killer" from a family friend because of his size at birth, his colic and his teething.

ERRORS PATENT
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant claims the trial court erred in granting the State's challenges for cause during the Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), voir dire as to jurors who merely expressed reservations about the death penalty. A defendant tried for a capital offense who does not receive the death penalty has no valid Witherspoon complaint. State v. Edwards, 406 So.2d 1331, 1346 (La.1981) (defendant who does not receive death penalty cannot complain that trial court improperly dismissed thirteen prospective jurors on Witherspoon grounds); State v. George, 371 So.2d 762, 765 (La.1979); State v. Lopez, 484 So.2d 217, 220 (La.App. 4 Cir.1986); State v. Durham, 94-1036, p. 23 (La.App. 5 Cir. 4/16/96), 673 So.2d 1103, 1116. The defendant did not receive the death penalty. Accordingly, he cannot raise this claim.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, defendant claims that the trial court erred in granting the State's challenges for cause as to two jurors during the general voir dire, Mr. Berry and Ms. Brown. The record indicates that the State ultimately exercised all of its peremptory challenges. La.C.Cr.P. art. 797 provides that the State or defendant may challenge a juror for cause on the following grounds:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or *1106 innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
La.C.Cr.P. art. 798 provides additionally that the State, but not the defendant, may challenge a juror for cause on the following grounds:
(1) The juror is biased against the enforcement of the statute charged to have been violated, or is of the fixed opinion that the statute is invalid or unconstitutional;
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:
(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; or
(c) That his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; or
(3) The juror would not convict upon circumstantial evidence.
A trial court is vested with broad discretion in ruling on challenges for cause; its rulings will be reversed only when a review of the entire voir dire reveals that the court's exercise of discretion was arbitrary and unreasonable, with resultant prejudice to the defendant. State v. Knighton, 436 So.2d 1141, 1148 (La. 1983); State v. Hawkins, 90-1235, pp. 11-12 (La.App. 4 Cir. 9/15/95), 667 So.2d 1070, 1079. See also State v. Jacobs, 99-1659, p. 5 (La.6/29/01), 789 So.2d 1280, 1284; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1281 (a trial judge's ruling on a challenge for cause will be reversed only when a review of the entire voir dire reveals that the trial court abused its discretion).
In addition to La.C.Cr.P. arts. 797 and 798, La.C.Cr.P. art. 787 authorizes a trial court to "disqualify a prospective petit juror from service in a particular case when for any reason doubt exists as to the competency of the prospective juror to serve in the case." La.C.Cr.P. art. 787 should be read in para materia with La. C.Cr.P. arts. 797 and 798. State v. Letulier, 97-1360, p. 8 (La.7/8/98), 750 So.2d 784, 790. The standard for reviewing a trial court's disqualification of a petit juror is the clear abuse of discretion standard. Letulier, 97-1360, p. 9, 750 So.2d at 790. The Official Revision Comment to La. C.Cr.P. art. 787 characterizes the article as "very broad," but states that the article "is essential to give the court a wide latitude to determine jurors' qualifications in the particular situation of each case."
Defendant first argues that the trial court erred in granting the State's challenge for cause as to juror Mr. Berry. Mr. *1107 Berry made it through the Witherspoon voir dire. On the following morning, during the general voir dire, the trial court asked Mr. Berry how he was doing. He replied that he was kind of sick and did not feel good. The trial court later asked if there was anyone who for personal reasons could not serve. Mr. Berry indicated that he wished to speak privately, and a sidebar was held. Mr. Berry, who was fifty-four years old, said he was on medication that caused him to frequently urinate, and indicated to the court that he was on medication for high blood pressure and sinus problems, and also was using eye drops. The State later moved to challenge Mr. Berry for cause. Defense counsel said he had not heard Mr. Berry say anything to justify a legal challenge for cause. The trial court noted that Mr. Berry said he was taking medication that caused him to be drowsy, and that Mr. Berry had told the court during the Witherspoon voir dire about a prior heart attack. The record does not reflect that Mr. Berry said he was taking medication that made him drowsy. The trial court apparently interpreted Mr. Berry's statement indicating that he was taking sinus medication to mean that he was taking an antihistamine, which can cause drowsiness. Mr. Berry was the first juror struck for cause during the general voir dire. Although the State eventually exercised all of its peremptory challenges, it had not exercised one at the time it challenged Mr. Berry for cause.
It is obvious that the trial court concluded that Mr. Berry was not qualified to serve as a juror in this capital case, because of Mr. Berry's health problems. It cannot be said that the trial court clearly abused its discretion in arriving at this conclusion. Thus, the trial court had the authority to dismiss Mr. Berry of its own motion pursuant to La.C.Cr.P. art. 787.
Similarly, defendant claims the trial court erred in granting the State's challenge for cause as to Ms. Brown. Ms. Brown advised the court that her daughter was getting married on the upcoming Saturday. Nevertheless, she was initially selected as juror number eight. Following the selection of all twelve jurors and one alternate, the court recessed, planning to select the second alternate after lunch. Ms. Brown was sworn as a juror. After lunch, the trial judge stated that his secretary had advised him that when Ms. Brown went into the back at recess she got sick and had to go into the bathroom. Ms. Brown agreed with this assessment of her situation, and conceded that this had caused some concern among her fellow jurors. The trial court then addressed the issue of her daughter's wedding, advising her that the trial might well proceed into Saturday. The court asked her if the trial went to Saturday would she be so distraught by her inability to participate in her daughter's wedding that she would no longer be able to give the case her undivided attention. Ms. Brown indicated that she did not think that she would be able to give the case her undivided attention, even from the beginning. The State indicated that it would challenge Ms. Brown for cause, and defense counsel simply noted an objection.
Again, the trial court felt that Ms. Brown was not qualified to serve as a juror in this capital case because of health concerns and her ability to serve throughout the trial as a competent attentive juror. It cannot be said that the trial court clearly abused its discretion in granting the State's challenge for cause. Thus, this assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 3, 4 & 5
In these three assignments of error, which defendant groups together, he avers *1108 that he was denied his right to confrontation by the trial court's refusing to admit into evidence a portion of Det. Ronquillo's police report, the court's restriction of defense counsel's cross examination of Det. Ronquillo, and its restriction of the cross examination of Kathleen Green.
An accused is entitled to confront and cross examine the witnesses against him. La. Const. art. 1, § 16. La. C.E. art. 611(B) provides that a witness may be cross-examined on any matter relevant to any issue in the case. Due process affords a defendant the right of full confrontation and cross examination of the State's witnesses. State v. Van Winkle, 94-0947, p. 5 (La.6/30/95), 658 So.2d 198, 201-202. The trial court has the discretionary power to control the extent of the examination of witnesses as long as the court does not deprive the defendant of his right to effective cross-examination. State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473; State v. Robinson, 99-2236, p. 6 (La.App. 4 Cir. 11/29/00), 772 So.2d 966, 971. It has been held that evidentiary rules may not supercede the fundamental right to present a defense. Id. However, evidence may be excluded if it is irrelevant. See State v. Casey, 99-0023, pp. 18-19 (La.1/26/00), 775 So.2d 1022, 1037. Further, confrontation errors are subject to the harmless error analysis so the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error. State v. Broadway, 96-2659, p. 24 (La.10/19/99), 753 So.2d 801, 817.
Det. Ronquillo confirmed on cross examination that included in his police report was mention of an Audi automobile located in the 1300 block of Josephine, what the detective believed was in the next block in relation to the offense. Defense counsel asked something about it having been determined that the car was involved in "a" homicide, and Det. Ronquillo said that he believed it was just a car that had caught fire. Defense counsel sought to show Det. Ronquillo page four of the police report. Det. Ronquillo said he did not recall whether he had seen the particular item shown him by defense counsel. Det. Ronquillo traced the vehicle to a naval base in San Francisco, but he said there was never anything about it being involved in a homicide. Det. Ronquillo said he guaranteed that the car had not been assigned "to be reported on the homicide" involved in the instant case. When asked whether the report stated that the officer was sent out to investigate "its use by suspicion in a homicide," the State objected on hearsay grounds. The trial court said that what another officer told Det. Ronquillo was hearsay, and further stated that the whole line of questioning was irrelevant. Defense counsel noted his objection and proffered the report.
The four-page report is dated November 9, 1995, the day after the homicide in the instant case. The reporting officer is Officer Terrance Saulny. A space for the name of the appropriate detective is marked by an "X." The incident is reported as "impound vehicle for homicide." The vehicle was a four-door black Audi. The narrative portion of the report states that on that date, at approximately 2:55 p.m., Officer Saulny received an assignment from a sergeant in his district to go to the 1300 block of Josephine Street and locate the described vehicle, "that was used in a homicide by the wanted subject." Officer Saulny observed that the vehicle had been damaged by fire. It was eventually towed to the police pound.
Defendant argues that the report "suggested" that there may have been those, other than defendant, who were investigated in connection with the murder. This is speculation, as there is no evidence that anyone other than defendant, Linda Sunell *1109 and Kathleen Green were ever suspected of involvement in the crime. The vehicle was recovered by police before the victim had been identified, and almost two weeks before police went to the Coliseum Street apartment.
Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. Relevant evidence is generally admissible. La. C.E. art. 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La. C.E. art. 403. A trial court's ruling as to relevancy will not be disturbed absent a clear abuse of discretion. State v. Lewis, 97-2854, p. 20 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1017; State v. Badon, 95-0452, p. 8 (La.App. 4 Cir. 11/16/95), 664 So.2d 1291, 1296. A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. See State v. Lambert, 98-0730, p. 22 (La.App. 4 Cir. 11/17/99), 749 So.2d 739, 755, writ denied, XXXX-XXXX (La.1/26/01), 781 So.2d 1258; State v. Brooks, 98-0693, pp. 16-17 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 822-823.
The police report about the recovery of the Audi was not relevant to this case. Further, the probative value of the information in the report was substantially outweighed by the danger of confusion of the investigation, unduly misleading the jury. The trial court did not abuse its discretion in excluding the report from evidence and in sustaining the State's objection to this line of questioning.
Defendant claims that the trial court erred in sustaining the State's objection to defense counsel's questioning of Kathleen Green. Defense counsel asked numerous questions of Miss Green that related to her credibility. During a series of questions relating to Miss Green being taken into custody in Mississippi, she was asked whether she knew then what had happened with the homicide investigation while she was gone. Miss Green responded in the negative. Defense counsel then asked whether, at the time she was taken into custody she knew whether or not there was a warrant out for her arrest in New Orleans. The State's objection was sustained. Defense counsel asked Miss Green whether she was worried about that. The State objected again. A sidebar was held during which the trial court said it was sustaining the objection to the question as to whether Miss Green was worried, but that defense counsel could ask her if she was promised anything or offered leniency in return for her testimony. Defense counsel wanted to ask her if the thought had entered her mind while she was traveling that the investigation might have implicated her, and if she wanted to cooperate before she became a suspect.
The trial court erred in ruling on evidence on this issue. The court should have allowed development of the testimony regarding whether Miss Green knew of the warrant for her arrest because it may or may not indicate a motive affecting her credibility. Namely, would she enter into negotiations for immunity in exchange for the dismissal of the warrant and would she change her story to protect herself. This should have been admitted as relevant evidence. Considering the thorough cross-examination of Miss Green relative to her credibility, it was harmless error to not allow questioning on this topic. Thus, the guilty verdict rendered in this case was surely unattributable to any such error.

*1110 ASSIGNMENT OF ERROR NO. 6

In this assignment of error, defendant avers that the trial court erred in permitting the State to make an improper closing argument, one appealing to personal fears and prejudices.
The scope of closing argument "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant." La.C.Cr.P. art. 774. Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Williams, 96-1023, p. 15 (La.1/21/98), 708 So.2d 703, 716. However, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, cert. denied, Casey v. Louisiana, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000), citing State v. Martin, 539 So.2d 1235, 1240 (La.1989) (closing argument that referred to "smoke screen" tactics and defense as "commie pinkos" was inarticulate but not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. Id. Even where the prosecutor's statements are improper, credit should be accorded to the good sense and fair-mindedness of the jurors who have heard the evidence. State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397, writ denied, XXXX-XXXX (La.12/8/00), 775 So.2d 1078. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless "thoroughly convinced" that the argument influenced the jury and contributed to the verdict.
Defense counsel made four objections during the State's closing argument. The first objection was to the statement that the defense could not prove that Miss Green lied. That objection was sustained. The second objection, which also was sustained, was to the statement that the victim did not have a chance to defend his good character. The third and fourth objections, which were overruled and form the basis for this assignment of error, were to statements made apparently to buttress Det. Ronquillo's credibility as a homicide investigator. The prosecutor stated that one was not going to find a better homicide detective than Det. Ronquillo. The prosecutor continued, "Go [sic] forbid if one of your family members died." The objection was overruled, and the prosecutor continued "and the lead detective on the case." The defense lodged a second objection that was also overruled. That was the final objection.
It was harmless error for the prosecutor to put the jurors in the shoes of the victim by making a marginal appeal to the jury as victims of a crime. This improper statement was limited so it doesn't show significant impact on the outcome of the case. Further, it can't be said that hearing the statement would have caused the jury to convict defendant where it had been disposed to acquit defendant. We are not "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. Therefore, the argument is without merit.

ASSIGNMENT OF ERROR NO. 7
In this last assignment of error, defendant avers that the trial court erred in denying his motion for a new trial in that the verdict was contrary to the law and evidence, one of the grounds set forth in his written motion for new trial. Defendant argues the sufficiency of the evidence. An assignment of error reserved to the denial of a motion for a new trial alleging that the verdict is contrary to the law and *1111 the evidence presents nothing for appellate review. State v. Snyder, 98-1078, p. 37, n. 21 (La.4/14/99), 750 So.2d 832, 859, n. 21; State v. Bartley, 329 So.2d 431, 433 (La. 1976). This assignment of error will be treated as one urging that the evidence is insufficient to support defendant's conviction.
This Court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
Defendant was convicted of second degree murder, a violation of La. R.S. 14:30.1, which provides in pertinent part that it is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm.
Defendant attacks Miss Green's credibility. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Jones, 97-2591, p. 7 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169. A factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Harris, 99-3147, p. 6 (La.App. 4 Cir. 5/31/00), 765 So.2d 432, 435, writ denied, XXXX-XXXX (La.9/21/01), 797 So.2d 60.
Miss Green was taken into custody by police in Mississippi some two years *1112 after the murder. She ended up in a Mississippi mental institution because she claimed that she had flashbacks about the murder. Det. Ronquillo was contacted by Mississippi authorities and followed up on it. Miss Green told him in detail how defendant attacked the victim, eventually strangling him to death. Miss Green's story that; the victim was attacked by defendant, who was armed with an axe, was consistent with the blood evidence found at the scene. The blanket in which the victim's body was wrapped had gray or white cat hairs on it. Det. Ronquillo identified a police photograph of the apartment showing a grayish-white cat inside, looking out. Charles Howell testified that defendant used an axe while working for him, that defendant owned his own axe, and that defendant took it back and forth from his residence to his job. Michael Howell testified that two years after the murder defendant threatened that he had killed in the past, had gotten away with it, and would do it again. Miss Green admitted that she lied to police in November 1995, telling them the same story defendant and Linda Sunell didthat the victim had left to stay with his girlfriend.
Viewing all of the evidence in a light most favorable to the prosecution, although minor legal errors occurred during trial, any rational trier of fact could have found beyond a reasonable doubt that defendant killed Michael Vasquez at 2033 Coliseum Street, Apartment 2, while having the specific intent to kill or inflict great bodily harm.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Defendant was jointly indicted with Linda Sunell, who was at large at the time of defendant's trial.