STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2021 KA 0476

STATE OF LOUISIANA

VERSUS

JASON BRINGIER

*DATE OF JUDGMENT:*     DEC 3 0 2021

ON APPEAL FROM THE NINETEENTH JUDICIAL DISTRICT COURT
NUMBER 7140649, SECTION 8, PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

HONORABLE ANTHONY J. MARABELLA, JR., JUDGE

* * * * * *

Hillar C. Moore, III
District Attorney
April Leon
Jerri Ann Lee
Assistant District Attorneys
Baton Rouge, Louisiana

Counsel for Appellee
State of Louisiana

Mary Constance Hanes
New Orleans, Louisiana

Counsel for Defendant-Appellant
Jason Bringier

* * * * * *

BEFORE: GUIDRY, HOLDRIDGE, AND CHUTZ, JJ.

**Disposition: CONVICTION AND SENTENCE AFFIRMED.**

Holdridge J. concurs w/ reasons.
Guidry, P. Dissents and assigns reasons.

**CHUTZ, J.**

The defendant, Jason Bringier, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, and pled not guilty. Following a jury trial, he was found guilty as charged by unanimous verdict. He was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.[1] He now appeals raising two assignments of error. For the following reasons, we affirm the conviction and sentence.

## FACTS

On March 24, 2014, at approximately 1:00 a.m., the victim, Lucinda White, was fatally shot in the head at her home in Baton Rouge. At the time of her death, she was living with the defendant, who was the father of two of her three children. When the police arrived at the scene of the shooting, the victim's body was lying sideways on the bed in the children's room, with her head closest to the closet and her legs hanging off the bed. Most of the blood splatter was on the lower portion of the right closet door. A .40 caliber semiautomatic handgun was found at the head of the bed, with its hammer cocked back. The magazine contained ten rounds, but no live round was chambered in the weapon. A bullet projectile was found "sort of bound up" in a white sweater located near the foot of the bed. The sweater appeared to have two bullet holes, powder burns, and contained skull fragments. The exterior of the bedroom door "had a hole like a [fist] ... had been forced into it some kind of way." The damage to the bedroom door and frame was consistent with the door having been kicked in or forced in from the outside.

---

[1] The commitment order reflects a sentence of 999 years. The sentencing minutes and sentencing transcript, however, reflect a sentence of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The sentencing transcript prevails in the event of a discrepancy in the record concerning the sentence. See **State v. Lynch**, 441 So.2d 732, 734 (La. 1983).

Several hours after the shooting, at approximately 4:32 a.m., both of the defendant's hands and both sides of his face tested positive for gunpowder particles. A gunshot residue (GSR) test of the victim's right hand was negative.

Dr. Beau Clark, East Baton Rouge Parish Coroner, testified at trial that a gunshot wound to the head was the cause of the victim's death, and the manner of death was homicide. The victim was killed by a bullet traveling in a downward trajectory, entering the right side of her head and exiting the left side of her head, while moving from back to front. According to Dr. Clark, the muzzle of the gun that killed the victim was "either touching the [victim's] skin or just barely touching the [victim's] skin" at the time she was shot. An examination of the victim's body revealed she had suffered contusions of the head, torso, and the extremities "of various ages[,]" as well as an abrasion to her right lower leg. Dr. Clark opined that the bruises to the victim's wrists and upper arm varied from several days old to approximately a week old.

Dannette Daigle Story, a long-time friend and roommate of Dawn Van (the victim's mother), was a witness at trial. Story last saw the victim alive on March 23, 2014, sometime near midnight when the victim visited her mother and Story to deliver a pack of cigarettes. The victim was wearing the white sweater found in the children's room after her death. She was frustrated because she needed money to pay bills, and she and the defendant had not paid their rent.

Story also testified concerning an incident when the victim called her to come and pick her up. Story went to the residence the victim shared with the defendant, but no one would open the door. Looking through a window, Story saw the defendant holding a knife to the victim's neck.

The defendant provided different accounts of how the victim was shot. Initially, he claimed the victim returned home with her friend, Jessica Stephens, on

3

March 23, 2014, between 9:00 p.m. and 10:00 p.m. In this account, the defendant claimed he was in the master bedroom and the victim was in the children's room getting a basket of clothes at the time of the shooting. According to the defendant, the victim did not know where the clothes were, and he told her they were in the top of the closet. He stated he then heard a gunshot. The defendant claimed the victim had a gun in her hand when she went into the children's room because she was interested in "learning to shoot[,]" and he had recommended that she (or they) call her stepfather, Gary Fontenot, and ask to shoot on his property The defendant further claimed a phone call was made to Fontenot at approximately 12:30 a.m. According to Fontenot, however, the phone call was made at 10:30 p.m. Additionally, the defendant claimed he and the victim rarely argued and never had physical confrontations. Lastly, he claimed the door to the children's room had been damaged three months prior to the incident when one of the children hit it with a basketball.

Subsequently, after being confronted with the evidence concerning the victim's sweater, the results of the GSR tests, and the autopsy results, the defendant admitted he shot the victim, but claimed it was accidental. According to the defendant, he had a gun in his hand, the victim fell back as she was getting a basket out of the closet, and he accidentally shot her.

## DISCHARGE OF JUROR

In his first assignment of error, the defendant contends his rights were violated when, over defense objection, the trial court removed a juror who had been selected and sworn – and then failed to re-empanel her after offering to do so – based on the State's speculation that the juror might "at some point" blame or be prejudiced against the State because of the trial judge's previous threat to hold her in contempt for tardiness.

4

On September 24, 2019, Mahlinda Evans was called in panel 2 of the prospective jurors. Thereafter, she was selected as preliminary juror number 10 and sworn to serve.

On September 25, 2019, Evans could not be found, and her telephone was turned off. The court asked counsel for the defendant and counsel for the State whether there was any objection to striking Evans for cause for nonappearance and continuing with jury selection. The defense stated it wanted her on the jury. The State noted Evans' nonappearance "may shed some light on her interest in the case." The State conceded it "may just be a human error or honest mistake," but pointed out "in the interest of justice, we cannot proceed with 30 minute delays, especially when the trial gets going." The court ruled:

> All right. The defense objection is preserved for the record and noted but it is overruled. In the interest of judicial economy, since we do not have a jury, and since it does not prejudice the defense in any way, no preempts were used, the objection is overruled. We're going to strike Ms. Evans as a juror, so we will proceed under the assumption that we now have ten preliminarily selected.[2]

During the voir dire of panel 3 of the prospective jurors, Evans entered the courtroom. She explained she had failed to appear earlier because she went to her child's school for a parent conference. The court asked if Evans' telephone was working, and she answered affirmatively. The court stated when it had attempted to call Evans, it had received "a disconnect notice." Evans claimed her phone had been on and perhaps the wrong number had been dialed.

Evans exited the courtroom, and the court advised counsel it had made a decision to strike her under the "impression that she was not going to be found and could not be found." The court offered to put Evans back on the jury "unless there

---

[2]     At the end of voir dire on September 24, 2019, eleven preliminary jurors had been selected.

5

[was] an objection." The court asked counsel to write down whether they objected to Evans being placed back on the jury.

The defense objected to Evans' exclusion, arguing that other jurors had been late and the court "may have prematurely offered [Evans] up for ... exclusion." The defense noted Evans did eventually appear for service and had a reasonable explanation for being late. The defense also stated that Evans had not indicated that she would consistently be late in the future. The defense asked the court to reconsider having Evans back on the jury (i.e., defense counsel voted to have Evan placed back on the jury).

The State noted it had "objected to [Evans] the first go round" and the fact she had to address the court "not knowing who that came from" might prejudice the State if she was allowed to return to the jury.[3] The State argued "there is an appearance that [Evans] may at some point be prejudicial to the State and that is the only reason why I object to her being re-impaneled on the jury." When the court inquired whether the State wished to exercise a peremptory challenge against Evans, the State answered negatively. Thereafter, the court overruled the defense objection to Evans' exclusion from the jury.

Voir dire of prospective jurors is specifically designed to test their qualifications and competency. An accused has "a right to full voir dire examination" for this purpose. La. Const. art. I, §17. If not qualified, the prospective juror can be challenged for cause before he is sworn. La. Code Crim. P. arts. 795 and 797. This procedure is designed to protect the defendant and the State from unqualified and incompetent jurors and to avoid an aborted trial if an incompetent juror should serve. **State v. Baxter**, 357 So.2d 271, 274 (La. 1978).

---

[3] The State argued it would be prejudiced if Evans "remain[ed]" on the jury. Evans, however, had already been struck from the jury at this point, so the issue was whether or not she would be permitted to return to the jury.

6

A trial court is afforded broad discretion in determining whether to strike a juror for cause because of the trial court's ability to form a first-person impression of prospective jurors during voir dire. The trial court "has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire" as they respond to questioning, whereas the reviewing court reviews the matter only on a transcript in a record. Therefore, the trial court's rulings will not be disturbed unless a review of the voir dire as a whole indicates an abuse of that discretion. **State v. Diggs**, 2019-0956 (La. App. 1st Cir. 12/27/18), 294 So.3d 487, 491-92, writ denied, 2020-00181 (La. 7/24/20), 299 So.3d 69.

Further, the Louisiana Criminal Code provides the trial court with wide latitude to determine the qualifications of prospective jurors and the right to disqualify them independently of challenges by counsel. See La. Code Crim. P. art. 787 ("[t]he court may disqualify a prospective petit juror from service in a particular case when for any reason doubt exists as to the competency of the prospective juror to serve in the case.").

Louisiana Code of Criminal Procedure article 787 should be read *in pari materia* with La. Code Crim. P. arts. 797 and 798, which set forth the grounds upon which a juror may be challenged for cause. The excusal of a prospective juror by the trial court, even *ex proprio motu*, is within its authority under La. Code Crim. P. art. 787. Substantial deference is to be accorded a trial court's determination that a particular juror is unfit for service; in reviewing such determinations, the standard is whether the trial court's finding was "fairly supported by the record." Additionally, absent a clear showing of abuse of discretion, the trial court's ruling as to the qualifications of a juror to serve should not be disturbed on appeal. **State v. Letulier**, 97-1360 (La. 7/8/98), 750 So.2d 784, 790.

Louisiana Code of Criminal Procedure article 796 provides:

> If it is discovered after a juror has been accepted and sworn, that he is incompetent to serve, the court may, at any time before the first witness is sworn, order the juror removed and the panel completed in the ordinary course.

**State v. Williams**, 500 So.2d 811, 813 (La. App. 1st Cir. 1986), involved review of the substitution of an alternate juror for a juror who arrived late, but prior to the beginning of trial. This court held:

> Here, the juror was absent, as she was late for court. It is immaterial that she subsequently arrived for duty. At the time the trial judge was called upon to make a decision whether to replace her with the alternate, her whereabouts and reason for her absence were unknown. As in [**State v. Clay**, 441 So.2d 1227 (La. App. 1st Cir. 1983), <u>writ denied</u>, 446 So.2d 1213 (La. 1984)], the discharged juror was unavailable for questioning as to her inability or incompetency to serve.
>
> Consistent with **Clay**, 441 So.2d at 1230, and for the reasons stated above, we determine that the trial judge herein reacted in a prudent manner in replacing the juror. A court has the duty to require that criminal proceedings shall be conducted in an orderly and expeditious manner. A juror's failure to attend court interferes with the orderly administration of justice. <u>See</u> La. C.Cr.P. arts. 17, 20, 21.
>
> A defendant's right to have the original twelve jurors selected decide his fate is not absolute. Ample cause was present to discharge the juror. **Clay**, 441 So.2d at 1231.

**Williams**, 500 So.2d at 814.

**Hamilton v. Winder**, 2004-2644 (La. App. 1st Cir. 2/10/06), 924 So.2d 267, 269-70, <u>reversed</u>, 2006-0994 (La. 6/16/06), 931 So.2d 358 (per curiam), involved review of a trial court ruling disqualifying a juror and striking him from the jury when he was not in court ten minutes after court began on the day of trial. The trial court noted the juror had been late after every break and had already been admonished to be on time. **Id.** This court examined **State v. Cass**, 356 So.2d 396 (La. 1977) and **Clay**, 441 So.2d 1227, in deciding the issue.

We noted that in **Cass**, the trial court summarily dismissed a juror in open court after observing the juror apparently sleeping for two to four minutes.

8

Thereafter, the Louisiana Supreme Court reversed that decision, finding no legal cause to dismiss the juror and holding the trial court erred in failing to allow the parties to question the juror, on the record, as to his inability to perform his duties. **Cass**, 356 So.2d at 397-98. We compared **Clay**, where the juror had telephoned the trial court on the morning of the second day of trial stating that she was unable to attend trial because of some accident or a problem in her family that required her presence. In **Clay**, 441 So.2d at 1231, this court distinguished **Cass** on the basis of the "discharged juror's *unavailability* for questioning as to her inability or incompetency to serve."

In **Hamilton**, 924 So.2d 272, we concluded, "the establishment of the unavailability of a juror requires either an attempt by the trial court to contact the absent juror to determine his or her unavailability or actual contact or information regarding the juror's unavailability." We found the trial court had neither attempted to contact the discharged juror to determine his availability to serve nor was there any information that he was unavailable to serve. **Id**. Accordingly, we vacated the judgment of the trial court and remanded for a new trial. **Id**.

The Louisiana Supreme Court reversed the decision of this court in **Hamilton**, finding this court had "failed to appreciate the district court's discretionary power under La. Code Civ. Proc. art. 1631(A) to control the proceedings." **Hamilton**, 931 So.2d at 358.

In the criminal context, La. Code Crim. P. art. 17, in pertinent part, provides:

> A court possesses inherently all powers necessary for the exercise of its jurisdiction and the enforcement of its lawful orders, including authority to issue such writs and orders as may be necessary or proper in aid of its jurisdiction. It has the duty to require that criminal proceedings shall be conducted with dignity and in an orderly and expeditious manner and to so control the proceedings that justice is done.

9

See **State v. Hardman**, 2019-151 (La. App. 3d Cir. 10/9/19), 280 So.3d 787, 792 ("Given the virtually identical language of La. Code Civ. P. art. 1631(A) and La. Code Crim. P. art. 17, we find that the trial court's discretionary authority to ensure criminal proceedings are conducted in 'an orderly and expeditious manner' includes the authority to remove a juror for repeated tardiness.").

In the instant case, the defendant attempts to distinguish **Williams** on the basis that "Malinda Evans, was precluded from serving as a juror for a reason unrelated to her tardiness. The trial court was willing to re-empanel her after hearing her excuse and apology, which means the trial court no longer believed she should be disqualified from serving due to one incident of tardiness."

The issue is whether the trial court's determination that Evans was unfit for service is "fairly supported by the record." See **Letulier**, 750 So.2d at 790. The defendant fails to show a clear abuse of discretion in that determination. The record indicates on the second day of trial, Evans could not be found or contacted by telephone. When Evans eventually came to court, she revealed she had attended a parent conference rather than coming to court to serve on the jury. She apparently had made no attempt to contact the court to advise she would be tardy. Further, she claimed her telephone had been working even though when the court had attempted to call her, it had received "a disconnect notice." While the court offered to put Evans back on the jury, the offer was made contingent on neither the defense nor the State objecting, and the State did object. The defendant's claim that the trial court no longer believed Evans should be disqualified is pure speculation. The trial court acted within its discretion and its "duty to require that [the] criminal proceedings shall be conducted with dignity and in an orderly and expeditious manner and to so control the proceedings that justice is done." La.

10

Code Crim. P. art. 17; see **Hamilton**, 931 So.2d at 358; **Williams**, 500 So.2d at 814.

This assignment of error is without merit.

## OPINION TESTIMONY BY LAY WITNESS

In his second assignment of error, the defendant contends the trial court erred in overruling the defense's objection to a detective, who was not qualified as an expert, giving opinion testimony that blood splatter evidence was inconsistent with the defendant's explanation of how the shooting occurred.

Louisiana Code of Evidence article 701 provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
>
> (1)   Rationally based on the perception of the witness; and
>
> (2)   Helpful to a clear understanding of his testimony or the determination of a fact in issue.

The general rule is that a lay witness is permitted to draw reasonable inferences from his or her personal observations. **State v. Ulfers**, 2007-0832 (La. App. 1st Cir. 2/8/08), 2008 WL 441488, *14, writ denied, 2008-1100 (La. 1/16/09), 998 So.2d 90. **State v. Short**, 368 So.2d 1078, 1081 (La. 1979), cert. denied, 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979), held that "the opinion rule should not be applied so strictly as to exclude first-hand testimony that may be several inferences removed from raw sense perceptions, yet more helpful to the jury than mere recitation of such perceptions." Thus, if the testimony constitutes a natural inference from what was observed, no prohibition against it as the opinion of a non-expert exists as long as the lay witness states the observed facts as well. Therefore, the reviewing court must ask two pertinent questions to determine whether the trial court properly allowed such testimony: (1) was the testimony

speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness' observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error. **State v. Casey**, 99-0023 (La. 1/26/00), 775 So.2d 1022, 1033, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).

East Baton Rouge Parish Sheriff's Office Detective Rob Chambers testified he was the lead detective in the investigation of the victim's death. The defense asked to approach the bench after the following exchange:

> [STATE]: And wrapping up, Detective Chambers, you testified that you arrested [the defendant] because his statement, the second one, the inconsistent one that was inconsistent with the prior statements, you stated and your testimony that it still didn't line up with the evidence; how so?
>
> [CHAMBERS]: Because the -- the blood splatter on the bed is going from [left] to right --

At the bench, the defense objected that Detective Chambers' testimony was inappropriate because he was not a blood splatter expert. The State responded:

> My question was to ask about how the evidence -- physical evidence at the crime is inconsistent with the second statement that was inconsistent previously.
>
> I'm not seeking to elicit any responses on expert testimony, but what I am seeking to elicit where the subject of the testimony is such that a person of ordinary experience may make a natural [inference] about certain facts, a lay witness may testify as to such [inferences]. Additionally, where the subject of the testimony is such that any person of experience may make an inference from assertive acts or the witness may testify as to such inference as long as he provides an explanation of the facts.

The trial court ruled, "[t]he objection is overruled insofar as [Detective Chambers] can just lay the witness opinions as to his observations where they were and why he felt they were -- anybody can testify to that. But it's a close call." The court noted, "I think the location of blood splatters and the fact that they were at a

12

different place [than] where a layperson might have expected them to be, if he testifies to that opinion then I'm going to let him give it."

Thereafter, over defense objection, Detective Chambers testified the defendant's statement that "[the victim] was falling back, [the defendant] caught her, they were standing up, and [the defendant] shot her in the head" was inconsistent with the physical evidence because if the defendant's account was accurate, "[t]he blood splatter would have been higher up on the closet." The following colloquy then occurred:

[STATE]: Where was the blood -- blood splatter located?

[CHAMBERS]: It was on the bed, across the bed going left to right, and --

[STATE]: Going left to right, if you were in what position?

[CHAMBERS]: If you're facing.

[STATE]: Okay.

[CHAMBERS]: Into -- into low on the closet level with the bed, --

[STATE]: And let me --

[CHAMBERS]: -- which -- which indicates that the person's head was on the bed shot from right to left in the -- shooting across the bed and to -- to the closet.

Detective Chambers also indicated the blood splatter was "leveled with the bed[,]" rather than "leveled with the top of the closet[.]" On cross-examination, however, he conceded "there is some [blood splatter] up high."

The trial court properly allowed Detective Chambers' testimony. Rather than being speculative opinion evidence, the testimony was a recitation of facts based upon Detective Chambers' personal observation of blood splatter at the scene. Detective Chambers made the reasonable inference that if the victim had

been standing up when the defendant shot her, as the defendant claimed, the blood splatter would have been higher up on the closet doors rather than on the bed.

Moreover, any error in the admission of Detective Chambers' testimony was harmless beyond a reasonable doubt. See La. Code Crim. P. art. 921. The guilty verdict rendered in this case was surely unattributable to the challenged testimony, which was only one of many pieces of evidence that cast doubt on the defendant's theory that he accidentally shot the victim in the head while she was falling back. See **Sullivan v. Louisiana**, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); **State v. LeBlanc**, 2005-0885 (La. App. 1st Cir. 2/10/06), 928 So.2d 599, 604 ("lay opinion testimony on the relevant aspects of the physical evidence … was merely cumulative of the eyewitness testimony, and any error in admitting [the witness'] opinion as to causation … was clearly harmless."). Initially, the GSR evidence established the defendant lied to the police when he claimed the victim shot herself. Lying raises the inference of a guilty mind and an awareness of wrongdoing. See **State v. Frickey**, 2015-0511 (La. App. 1st Cir. 9/18/15), 2015 WL 5516300, *4, writ denied, 2015-1966 (La. 11/18/16), 210 So.3d 283. Further, injuries to the victim's body indicative of domestic violence, as well as physical evidence at the scene indicating that the door to the room where the victim was killed had been recently punched and forced open, supported the State's theory that the defendant intentionally shot the victim after forcing his way into the room. Lastly, the State presented testimony from Story that the defendant had held a knife to the victim's neck in a prior incident. While this testimony was inadmissible as character evidence to prove the defendant acted in conformity with bad character in the instant incident, the testimony was admissible as proof of absence of mistake or accident in the instant incident. See La. Code Evid. art. 404(B)(1).

This assignment of error is without merit.

**CONVICTION AND SENTENCE AFFIRMED.**

STATE OF LOUISIANA

VERSUS

JASON BRINGIER

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2021 KA 0476

 **HOLDRIDGE, J., concurs.**

I respectfully concur with the report. In a criminal jury trial, "when a prospective juror is accepted by the state and the defendant, he shall be sworn immediately as a juror." La. C.Cr.P. art. 788. After all parties have completed the selection of the jurors and all challenges are resolved, "the jurors shall then be sworn together to try the case ... ." La. C.Cr.P. art. 790. Prior to the final swearing in of the jurors, in accordance with La. C.Cr.P. art. 790, the state and the defendant may exercise all peremptory challenges available to each side even as to jurors who had been previously accepted and sworn. La. C.Cr.P. art. 799.1. Similarly, at this stage in the proceeding, the trial judge has great discretion to remove any juror "for any reason" if doubt exists in the trial judge's mind as to the competency of the prospective juror to serve. La. C.Cr.P. art. 787.

In this case, the trial judge did not abuse his great discretion to remove a prospective juror who did not timely appear in court, did not call to let the trial court know that she may be late to attend a personal matter, which placed her late for appearing in court, and was unavailable when the trial court's staff attempted to contact her. Clearly, the trial court was reasonable in finding that "doubt existed as to the juror's competency to serve." See La. C.Cr.P. art. 787

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2021 KA 0476

STATE OF LOUISIANA

VERSUS

JASON BRINGIER

**GUIDRY, J., dissents and assigns reasons.**

**GUIDRY, J., dissenting.**

I am constrained to dissent in this matter. The discretion afforded the trial court regarding Evans service on the jury was not properly exercised by the judge, but instead was delegated to the state and defense. They were allowed to decide whether to veto the judge's willingness to put Evans back on the jury in lieu of exercising a peremptory challenge. The state took advantage of this opportunity after responding negatively to the trial court questioning whether it wished to exercise a peremptory challenge. The judge heard Evan's explanation for her singular instance of tardiness and stated that his decision to strike her was made under the impression that she was not going to and could not be found. He then offered to put Evans back on the jury "unless there [was] an objection." That statement indicates that the trial court no longer believed she was incompetent to serve. This was his decision to make in his role as judge and it was error to abdicate that role. Therefore, I respectfully dissent from the majority's opinion in this matter.

1